Rich Hill Coal Company et al. *v.* Bashore.

Monarch Anthracite Mining Company et al.
*v.* Bashore.

452

Argued January 12, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Wm. A. Schnader,* of *Schnader & Lewis,* with him *Joseph S. Lord, III,* and *J. Hayden Oliver,* for plaintiffs and intervening plaintiffs.

*Guy K. Bard,* Attorney General, and *E. Russell Shockley,* Deputy Attorney General, with them *Oliver C. Cohen,* Deputy Attorney General, and *William H. Wood,* Special Deputy Attorney General, for defendant.

*M. Herbert Syme* and *Benj. R. Simons,* of *Syme & Simons,* for Pennsylvania Federation of Labor, filed a brief under Rule 61.

*Oliver K. Eaton, Roger J. Dever* and *Isadore Katz,* for United Mine Workers of America et al., intervenors.

OPINION BY MR. JUSTICE MAXEY, March 27, 1939:

This case comes to us on a bill in equity, later amended, filed by certain coal companies to restrain the Secretary of Labor and Industry from enforcing the Workmen's Compensation Acts of 1937 and 1938. These acts are: 1, the Act (No. 323) of June 4, 1937, P. L. 1552; 2, the Act (No. 552) of July 2, 1937, P. L. 2714, called the "Occupational Disease Compensation Act"; and 3, Act No. 20 of the Special Session of 1938, approved September 29, 1938, P. L. 52. "1" is an "amendment" to the Workmen's Compensation Act of 1915, P. L. 736. "2" is a "supplement" to the Act of 1915. "3" amends Article II of the Act of 1915 "by adding a new section 201.1 thereto and imposing the presumption

of negligence upon employers; providing for admission of certain evidence; and providing for double damage under certain circumstances." These acts are alleged to be unconstitutional. A motion was made for a preliminary injunction; a rule to show cause was granted; and testimony was later taken, showing, inter alia, the workmen's compensation insurance rates under the Act of 1915 and by comparison under the acts challenged. These new rates, as fixed by the Pennsylvania Compensation Rating and Inspection Bureau, represent an increase of 62½ per cent over the rates under the old act. This would mean to one of the plaintiffs, the Morrisdale Company, a cost of 11½ cents per ton of coal mined. It was also testified that the plaintiff just named considered rejecting the compensation system imposed by Act No. 323, but it was advised by insurance brokers that no insurance carrier in Pennsylvania would insure it against the liability in actions at law under the provisions of section 201, Article II of Act No. 323, which strips employers rejecting the compensation law of the following defenses: (1) the negligence of a fellow employee, (2) assumption of risk, (3) contributory negligence. (It should be noted in this connection that the hereinafter discussed Act No. 20, passed by the legislature after being called in special session, approved September 29, 1938, amending the Act of 1915, as reënacted and amended by the Act of June 4, 1937, P. L. 1552, No. 323, provides, inter alia, that "when injury results to an employee in the course of his employment it shall be presumed that the employer's negligence caused said injury, which presumption may be rebutted by the employer.") The other plaintiff, Rich Hill Coal Company, offered evidence that as to it the insurance rates under the new law represent about the same increase as the other plaintiff showed. The President of Rich Hill Coal Company testified as follows: "A. It is impossible for us to carry our own insurance, we are not large enough, the expense would be too great, we cannot reinsure, we

will have to carry our own rate below $10,000 or up to $10,000 and it is just putting the small operator out of business. Q. In other words, from a business standpoint you could not possibly afford to take the risk involved in rejecting the Act and carrying your own risk up to $10,000 per accident, is that correct? A. We couldn't do it, one major accident would put us out of business. Q. Do I understand from that that you cannot get insurance for the first $10,000 of your liability? A. No, sir; we cannot."

Upon the conclusion of the testimony, the court heard arguments upon the constitutional questions raised by the bill. On December 29, 1937, the defendant filed preliminary objections to the bill. The next day a preliminary injunction was granted. On December 31, 1937, 43 anthracite coal mining companies presented to the court a petition asking leave to intervene as parties plaintiff. The petitioners, all of whom are taxpayers, averred that, though they had all elected to pay compensation under Article III of the Workmen's Compensation Act of 1915, they had "been compelled as a matter of economic necessity to reject the system imposed by Acts Nos. 323 and 552." On December 31, 1937, leave to intervene was granted and the enforcement of Acts Nos. 323 and 552 was restrained against these intervening plaintiffs upon their posting required bonds. On January 3, 1938, the Attorney General and the attorney for plaintiffs, respectively, filed the following stipulation: "The testimony adduced in support of the rule to show cause represents all the testimony the plaintiffs have to offer, and for the purpose of this case, shall be considered as if taken on final hearing of the bill of complaint. The defendant has no testimony to offer for the purposes of this case."

On the same day, the Attorney General presented to the Supreme Court the stipulation just quoted and also a petition averring that the only question between the parties was the constitutionality of Acts Nos. 323 and

552 and praying the court to bring the record before it on special certiorari so that the case might be decided finally at an early moment. Counsel for plaintiffs then notified this court that counsel for the intervening anthracite operators desired to present certain additional facts to the court in support of their contention that Acts Nos. 323 and 552 were unconstitutional. The Attorney General declared that these facts would be stipulated by agreement. The defendant later asserted that the facts could not be stipulated. Thereupon, on May 12, 1938, certain of the intervening plaintiffs, to wit: Monarch Anthracite Mining Company, The Kingston Coal Company, Glen Alden Coal Company, The Lehigh Valley Coal Company and The Hudson Coal Company, filed a separate bill in equity in the Court of Common Pleas of Dauphin County setting up certain facts, inter alia, as follows: "The total number of persons employed in the anthracite industry in Pennsylvania is approximately 100,000. Between 1926 and 1935, the working capital of the anthracite industry shrank from $111,097,223 to $8,860,217. During the years 1932, 1933, 1934 and 1935, the industry suffered losses, respectively, of $10,-507,779, $8,572,586, $1,664,142 and $10,235,977. In 1934, the total amount of workmen's compensation liability incurred by anthracite operators in Pennsylvania was $2,600,000. The anthracite industry was also conducted at a loss in 1937, and the workmen's compensation liability for 1936 and 1937 was approximately the same as in 1934. The cost of workmen's compensation to the anthracite operators of Pennsylvania would be increased by more than 100 per cent over the cost of workmen's compensation under the Act of 1915, solely by reason of the increased schedules of compensation. The features of Act No. 323 other than its schedules would increase the costs of compensation by an additional 20 per cent. In many cases of total permanent disability and death from accident, Act No. 323 would increase the compensation benefits by approximately 200 per cent. The esti-

mated compensation liability of anthracite operators under Act No. 552 during the first year of its operation would be $8,640,000. This amount would be increased by $2,500,000 during each of the three successive years so that in the fourth year of the operation of the act the total compensation liability of anthracite operators under Act No. 552 would be $16,200,000. Under the provisions of the Workmen's Compensation Act of 1915, the plaintiffs were exempted from the requirement that insurance be carried against their liabilities under Article III. Prior to January 1, 1938, anthracite operators who applied for an exemption from the duty of insuring against liability under Article III were required by the defendant to deposit with him securities of the value of many millions of dollars in order to obtain such exemption. They were also required to carry excess insurance against such liability. If the anthracite operators were to accept the provisions of Acts Nos. 323 and 552, they would be required to deposit additional securities in the amount of millions of dollars in order to obtain an exemption from the duty of carrying insurance against workmen's compensation liability, and they would also be required to carry additional and greater amounts of excess insurance." The defendant later filed preliminary objections to the bill of the five anthracite coal companies above named.

Claiming that defendant failed to comply with Equity Rule No. 49 by neither placing the case upon the argument list for hearing nor filing an answer on the merits, plaintiffs, on July 25, 1938, filed as appears from the docket entry a "suggestion for judgment pro confesso in favor of plaintiffs against defendant for failure to file an answer as provided by Equity Rule No. 49." The defendant contends that Equity Rule No. 49 merely defines the default which warrants the entering of a decree pro confesso but that the decree must be entered under Rule No. 51. Defendant adds: "This was never done." In *Solar Elec. Co. v. Brookville Boro. et al.*, 300 Pa. 21,

150 A. 92, this court held that when a bill is taken pro confesso for want of an appearance or answer, the prothonotary's only function is to enter plaintiff's order to that effect. Under Equity Rule No. 51 the court must enter the appropriate final decree. On December 15, 1938, there was filed "certiorari sur appeal to No. 35, May Term, 1939, from the Supreme Court."

This record will have to be returned to the court below for the development of *facts* essential to the due determination of the important issues involved. However, as some of the questions presented by this record are purely questions of law, we deem it our duty to decide them now so that a final decision of all the questions involved may be accelerated.

The legislature derives its power to enact a Workmen's Compensation Act from Article III, section 21 of the Constitution, being the amendment adopted November 2, 1915. This constitutional authorization of such an act lays down three fundamental requirements of the act: (1) The compensation which may be required of employers must be "reasonable." (2) The injuries compensated must arise "in the course of employment." Compensation for occupational diseases of employees must also by clear implication arise in the course of employment. (3) The acts authorized must provide for benefits to be paid by employers to their employees. The constitutional provision referred to does not authorize acts which would provide compensation from employer "A" to the employees of employer "B."

It is scarcely necessary to point out that a Workmen's Compensation Act must conform not only to the limitations of the enabling constitutional provision but also to the limitations of the applicable provisions of the federal and state constitutions.

As to the first test of reasonableness, we are not able from the record now before us to decide whether or not all the prescribed compensation rates are reasonable. A decision as to this depends on the facts in the cases pre-

sented and when these cases reached us the essential facts had not been established. We are therefore sending these cases back to the court below for the full development of facts and for proper and ample findings. We may pertinently say at this point, however, that when the necessary facts are found it will be a matter for judicial determination whether the challenged compensation acts *are* reasonable. It is elementary that the money (i. e., the wealth) used in the payment of compensation benefits to employees must be produced by the joint endeavors of the capital and labor which have united their energies and effort in the production of wealth. If compensation rates are fixed so high that capital does not reap a fair share of reward from these joint endeavors or if the rate is fixed so high as to wipe out or unduly encroach on that margin of a just return to which capital is entitled, the compensation rate is unreasonable and therefore the act prescribing it is invalid and unconstitutional. There can be no more fatuous policy than one of so burdening industry as to kill the spirit of enterprise and to paralyze what would otherwise be normal initiative and energy. One of the earliest and most widely known and accepted fables is that of "killing the goose that laid the golden eggs." In this venerable fable the man who committed this act of folly is held up as an archetype to be avoided. The courts of this state and nation have in countless decisions recognized and enforced the right of those who invest and manage capital to a fair share of the fruits of such investment and management. It has been held by the United States Supreme Court that even the owner of a business dedicated to the public service, such as a railroad, is entitled to "fair or reasonable profit": *Dayton-Goose Creek R. Co. v. U. S. Interstate Commerce Com.,* 263 U. S. 456. In *I. C. Com. v. U. P. R. R. Co.,* 222 U. S. 541, the Supreme Court of the United States declared that "an order of the Interstate Commerce Commission may be set aside if it appears that the rate is so

low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law." In *Pub. Serv. Com. v. Beaver Valley W. Co.*, 271 Pa. 358, 114 A. 373, this court declared that if the rates allowed to a public service company are inadequate to provide a reasonable return on the property invested in the corporation, the result is confiscation. It is equally true that if the rates of compensation which the legislature orders employers to pay injured employees prevents any return or a reasonable return on the property invested, the result is confiscation—a situation intolerable in a constitutional government. Laws should conserve property, not destroy it. The tragic experiences of the peoples of other countries today clearly demonstrate that the step from a government's arbitrarily taking of property to its arbitrarily taking of life and liberty is a short one. In republics like ours the protection of life, liberty *and* property are the specific subjects of constitutional and judicial protection. The United States Supreme Court said in *Knoxville v. Water Co.*, 212 U. S. 1: "The courts, in clear cases, ought not to hesitate to arrest the operation of a confiscatory law, but they ought to refrain from interfering in cases of any other kind. . . . Our social system rests largely upon the sanctity of private property, and that State or community which seeks to invade it will soon discover the error in the disaster which follows." In *Pierce, Governor of Oregon, v. Society of Sisters*, 268 U. S. 510, the same court said: "Prevention of impending injury by unlawful action is a well recognized function of courts of equity."

A Workmen's Compensation Law which meets the test of reasonableness in compensation as between the employee who *receives* and the employer who *pays* is one of the most socially beneficent enactments which statesmanship is capable of producing. On the other hand, a Workmen's Compensation Law which places upon any industry a burden so crushing that it makes that indus-

try's existence either impossible or, to its owners, economically undesirable, is a measure which the workmen themselves should emphatically condemn and reject, for it paralyzes the very activities on which their economic well-being depends. Unprofitable industries soon become idle industries; idle industries mean idle capital, and in all ages and countries idle capital has always meant idle men.

There are many provisions of Act No. 323, which are alleged to be unreasonable. For example, under section 306 A of Act No. 323 the minimum compensation "for the first 500 weeks after the 7th day of total disability, . . . shall not be . . . less than twelve dollars per week, . . . provided that if total disability shall continue for a period of four weeks or more, the employee also shall be entitled to receive compensation for the first seven days of total disability. Should total disability become permanent, then, in addition to the compensation provided for 500 weeks, and beginning at the expiration of the 500 weeks, the sum of $30 per month shall be payable during such permanent total disability prior to death." It is obvious that the above provision for compensation for life imposes a heavy burden on industry and if the complainants can prove that the minimum of $12 per week exceeds in a substantial number of instances the wages paid, the provision should be adjudged unreasonable. A law which requires an employer to pay a disabled employee, and particularly for a long period, more than the employee earned before his disability arose, does not conform to the constitutional test of reasonableness. The most earnest advocates of Workmen's Compensation Laws never contemplated that the rate of compensation for disabled employees should be placed so high as to make idleness more remunerative than work.

Another provision in Act 323 which is alleged to be unreasonable is that which gives to a widow of a deceased employee, "if there be no children, 44% of wages

but not in excess of twelve dollars per week." This compensation shall be paid during 500 weeks, except that, in the case of a widow, if she shall remain unmarried, compensation shall continue after said period of 500 weeks, at the rate of $5 per week for life. If the widow remarries, if she be other than a nonresident alien widow, the compensation of such widow shall continue two years from the date of such remarriage. The rate of compensation for widows with children increases substantially. It is obvious that in mining or other pursuits in which there might be a high percentage of deaths resulting from injuries or occupational diseases, only those concerns which, even under the operation of the Workmen's Compensation Act of 1915, were left with a large margin of net income, would be able to continue their industrial operations. However, whether or not the challenged act is unreasonable in respect to a sufficiently large number of employers to make the act unconstitutional on that ground is primarily a factual question, which can be decided only on an ample record. Plaintiffs contend that during the 1st, 2nd, 3rd and 4th years of the operation of Acts Nos. 323 and 552, the cost to the anthracite industry of Pennsylvania will be, respectively, $14,360,000, $16,880,000, $19,400,000 and $21,920,000. It is said that the cost to this industry in 1937 before the passage of the challenged acts was $2,600,000. Plaintiffs in their brief declare as follows: "Stated differently, under the Workmen's Compensation Act of 1915, as amended prior to 1937, the cost of workmen's compensation to the anthracite industry for the 4 years beginning with 1938, would have been $10,400,000; but under Acts Nos. 323 and 552 it would be $39,080,000. Of this amount, the employers would be obliged to pay at least $26,516,000. (The balance would be paid by the State, if, by any chance, Section 321[1] of Act No. 323 and Section

---

[1] This section provides: "In the case of an employee who dies as the result of an injury received in the course of his employment and who leaves no dependents entitled to receive in excess of fifteen

7(a)$^2$ of Act No. 552 should be held valid.)" If these or substantially similar facts are established, it will be a question for the courts to decide whether the acts which place such a heavy burden on one of the state's major industries provide only for "reasonable compensation." The reasonableness of the compensation prescribed in these Workmen's Compensation Laws, with their multifarious provisions, must be determined, as the United States Supreme Court in *Interstate Commerce Com. v. Ill. Cent. R. R.*, 215 U. S. 452, 472, said that the reasonableness of freight rates must be determined, to wit, "by a consideration of many facts." These can be developed only after a full hearing before the court below.

Act No. 323 is also challenged because it fails to measure up to the constitutional standard above mentioned, to wit, the injuries giving rise to liabilities under an avowedly "Workmen's Compensation Act," as the act under review, with its amendments, is, must be those of

---

hundred dollars ($1500.00) compensation under this act, the employer or his insurance carrier, as the case may be, shall pay the sum of fifteen hundred dollars ($1500.00) to the department, or the difference between the amount paid to such dependents and the sum of fifteen hundred dollars ($1500.00). . . .

"(b) One-fourth of the amount received in each case under this section by the department, but, not, however, in excess of two hundred and fifty dollars ($250.00), shall be paid by it into the Federal Rehabilitation Fund of the State Treasury, through the Department of Revenue, which amount shall be credited to a ledger account to be known as the industrial rehabilitation account. . . .

"(c) The balance of any amount received by the department under this section shall be paid by it into the State Workmen's Insurance Fund of the State Treasury, through the Department of Revenue, which amount shall be credited to a ledger account to be known as the second injury reserve account. All amounts credited to the second injury reserve account are hereby appropriated to the department for the payment of the compensation provided in clause (g) of section three hundred and six of this act. . . ."

$^2$ This section refers to occupational diseases and provides that for such the major portion of the compensation shall be paid "by the Commonwealth out of moneys to the credit of the Second Injury Reserve Account in the State Workmen's Insurance Fund."

employees of the compensator and must arise "in the course of employment." Section 203 of this act imposes liability on the primary employer for injuries to the employees of subcontractors "engaged in services furthering the employer's regular business entrusted to such employee or subcontractor . . . whether said injury [to the subcontractor's employee] occurred upon premises occupied or controlled by the employer or not, provided only that the injury occurred in the course of employment." Section 203 of the Workmen's Compensation Act of *1915* imposed on the general employer liability for injuries to those "laborers or an assistant hired by an employee or contractor for the performance *upon such premises* [italics supplied] of a part of the employer's regular business entrusted to such employee or contractor." In *Qualp v. James Stewart Co.,* 266 Pa. 502, 109 A. 780, this court held the applicable section of the Workmen's Compensation Act of 1915 related only to employees who were "upon premises under his [the employer's] control." In *Gallivan v. Wark Co.,* 288 Pa. 443, 449, 136 A. 223, this court in construing section 203 of Article II of the 1915 Workmen's Compensation Act referred to this section as "the most drastic interference with individual rights to be found in the act," and that it "forced liability upon parties who are not in privity of contract." It is clear that section 203 of the Act No. 323 of 1937 goes far beyond "the drastic interference" of the old act. Under the old act, the "employee" of the subcontractor could not recover from the principal contractor unless he was injured on the premises of the latter or under his control. This propinquity between the primary employer and the laborer made it possible for the employer to supervise the conditions of the laborer's employment and afforded some logical basis for holding that the former was liable to the latter for any personal injuries received on premises under the former's control. Such a holding marked the utmost limit this court can go in giving the statuses of "employee" and "employer,"

respectively, to two persons who in fact have no such contractual relation to each other. Now we are asked to hold that an employee of a subcontractor "B" who anywhere on premises no matter how remote from and how far beyond the control of, contractor "A," is injured, can recover from "A" in an action at law for such injury received by that employee in the course of his employment by subcontractor "B." This imposes responsibility upon an employer without giving him reciprocal authority. We cannot judicially hold that when the people of this Commonwealth authorized the General Assembly to enact "laws requiring the payment by employers, or employers and employees jointly, of reasonable compensation for injuries to employees arising in the course of their employment and for occupational diseases of employees," they intended to confer or did confer upon the General Assembly an authority to enact a law making an employer liable to the employee of a subcontractor employer on premises remote from the first employer's premises and over which he did not have the slightest control.

It is conceded in the brief of defendant that section 302(b) of the new act permits the rejection or acceptance of the act *only as to employees who come upon the premises*. The brief says: "In other words, whether the statutory employer accepted or rejected the act, in so far as the statutory employees who never come upon the premises are concerned, he could not avoid his common law liability. Thus, an election of the act would not avoid the operation of the amendment to Section 203, and cannot be considered a compulsion to accept the act." Section 303 of the new act provides that acceptance of the compensation system shall constitute a surrender by the employee of his common law rights of recovery against the general contractor. But employees of a subcontractor who *have not entered upon the premises of the general contractor* have not (according to section 302(b) of the new act) accepted the compensation

system, as between them and the general contractor. Therefore, they may invoke the liability created by section 203 and in the ensuing suit the defendant will find himself denied of all his former common law defenses, and under section 201.1 of Act No. 20, passed September 29, 1938, P. L. 52, and amending the amending Act No. 323, passed June 4, 1937, he would, if we did not adjudge most of its provisions unconstitutional (as we do hereafter), find himself confronted with the "presumption" that his "negligence caused said injury" and with the legislative fiat that "declarations, remarks and utterances made by the injured employee within twelve hours after the injury was sustained shall be admissible as competent evidence."

In *Holbrook v. Wilkes-Barre*, 309 Pa. 586, 164 A. 719, this court affirmed per curiam the judgment of the Superior Court. In the opinion of President Judge TREXLER, speaking for that court, appears the following: " 'Where a contract is let for work to be done by another in which the contractee reserves no control over the means of its accomplishment, but merely as to the result, the employment is an independent one establishing the relation of contractee and contractor, and not that of master and servant,' " (citing cases). In *McColligan v. Pa. R. R. Co.*, 214 Pa. 229, 63 A. 792, this court said: "The relation of master and servant exists where the employer has the right to select the employee, the power to remove and discharge him, and the right to direct both what work shall be done, and the way and manner in which it shall be done." Section 104 of the Workmen's Compensation Act of June 2, 1915, P. L. 736, defines the word "employee" as follows: "The term 'employee' as used in this act is declared to be synonymous with servant, and includes all natural persons who perform services for another for a valuable consideration, exclusive of [certain enumerated] persons. . . ." See also the following cases: *McDonald v. Levinson Steel Co.*, 302 Pa. 287, 153 A. 424; *Simonton v. Morton*, 275 Pa. 562,

119 A. 732; *Kelley v. D., L. & W. R. R. Co.*, 270 Pa. 426, 113 A. 419; *De Nardo et ux. v. Seven Baker Bros.*, 102 Pa. Superior Ct. 347, 156 A. 725, and *Phipps v. Greensboro Gas Co.*, 109 Pa. Superior Ct. 382.

When the Constitution says that the legislature may enact laws requiring employers to pay reasonable compensation for injuries to employees arising in the course of their employment, it gives neither to the legislature nor to the courts authority to declare injuries arising *outside* the course of employment, to be injuries *in* the course of employment. The Constitution would be a "dead letter" if its plain prescriptions could be disobeyed by perverting the Constitution's words and phrases from their true and long accepted meanings.

Section 203 of the Act of June 4, 1937, purports to be part of "an act defining the liability of an employer to pay damages for injuries received by an employee in the course of an employment, establishing an elective schedule of compensation, and providing procedure for the determination of liability and compensation thereunder." The act itself is called "The Workmen's Compensation Act." Section 203 of that act *as amended by the Act of June 4, 1937*, is unconstitutional in that it goes beyond the power delegated to the legislature on this subject-matter.

Article III, section 301(b) of Act No. 323 provides that "the right to receive compensation under this act shall not be affected by the fact . . . that a minor or other employee, on account of whose injury or death the benefits are claimed, was violating any law or rule or regulation of the business or industry or a positive order of the employer at the time of the injury, except that no minor or employee shall be entitled to receive compensation under this act, who, at the time of injury, was engaged in the commission of a felony."

It requires no argument to support the proposition that any employee who is injured while violating a law or a rule or regulation of the industry is not injured "in

the course of employment." In *Shoffler v. Lehigh Valley Coal Co.*, 290 Pa. 480, 139 A. 192, this court held that where an employee of a coal mining company goes, during the time of his employment, upon a locomotive belonging to and on the premises of his employer, and reverses and starts the engine in violation of the Act of June 2, 1891, P. L. 176, and is killed, no compensation can be received for his death, inasmuch as he committed an illegal act, and, when he started the engine, he ceased to be an employee. In that case we said: "It is a general principle in the law of master and servant, that, where an employee voluntarily, and without necessity, abandons his employment, or steps entirely aside from the line of duty, he suspends the relation of employer and employee and puts himself in the position of a stranger or licensee: *Spokane & I. E. Co. v. Campbell*, 241 U. S. 497, 508; Labatt's Master & Servant, 2d ed., Vol. 4, p. 4706. Under our Workmen's Compensation Act the fact of employment is not the sole basis for compensation. It requires also that the injury shall have occurred in the course of employment." In connection with this statement it should be observed that the requirement referred to is a requirement of the act, because the Constitution does not give the legislature power to provide for compensation to employees whose injuries do not arise in the course of employment. This court said further in that case: " 'Course of employment' does not include (a) . . . (b) injuries received in the commission of an act which is in direct violation of the law; or (c) an act contrary to the positive orders of the employer." In *Walcofski v. Lehigh Valley Coal Co.*, 278 Pa. 84, 122 A. 238, this court held that when a workman goes into a certain part of the mines where there is gas, in disobedience to his foreman's orders, and attempts to light a fuse, thereby causing an explosion, he is not doing something in the course of his employment and is not entitled to compensation. We said in that case: "There can be no legal excuse for failure to obey an absolute

statutory requirement: *Jones v. American Caramel Co.*, 225 Pa. 644 [74 A. 613]. . . . We have consistently followed a public policy announced long ago by this court; it will not aid a man who grounds his cause on an immoral or illegal act. . . . As we have unhesitatingly held employers to a strict rule for failure to obey social welfare acts in the interest of safety to other workmen, so also the law as it relates to employees mining coal under these circumstances must be enforced." In *Dickey v. Pittsburgh & Lake Erie R. R. Co.*, 297 Pa. 172, 146 A. 543, this court held: "Injuries resulting from those acts which are in direct hostility to and in defiance of positive orders of the employer concerning instrumentalities, places or things about or on which the employee has no duty to perform, and with which his employment does not connect him, are not compensable under the clause in question." By "clause" was meant "in the course of employment" as used in the Workmen's Compensation Act and in Article III, section 21 of the Constitution.

It is contended that the word "law" as used in section 301(b) "applies only to any law or rule or regulation of the *business or industry*"; in other words, it is contended that by "law" a state law defining crimes and misdemeanors is not meant. We cannot accept this view. The fact that the section expressly excludes *felonies* as a defense, shows that it was not intended to exclude *misdemeanors*. The word "law," as used in legislative enactments, has a well known and established meaning. It does not mean a mere rule or regulation of *business*. Law is defined by Blackstone, Vol. 1, sec. 44, as "a rule of civil conduct prescribed by the supreme power in a state, commanding what is right and prohibiting what is wrong." This definition has always been accepted by the courts of this Commonwealth. See *Appeal of Locke*, 72 Pa. 491. The word "law" as used in the Constitution has the above meaning. See, for examples, Art. I, sec. 12, and Art. III, sec. 7, of the Constitution. Moreover,

there are certain rules and regulations relating to the conduct of employees in this state which have been by statute given the force of *law*. For example, one of these is "General Rule 25, Article XXV, Act of June 9, 1911, P. L. 756, 829, as amended by the Act of April 30, 1929, P. L. 880, sec. 1, 52 PS sec. 1305, which states: 'In all gaseous and in all dry and dusty mines, shot firers or other persons charging holes for blasting shall use incombustible material for tamping. All holes in any mine before being fired shall be solidly tamped the full length of the hole: . . . Any person who violates this rule shall be deemed guilty of a misdemeanor.' See also Special Rule 1, Article XXV, Act of June 9, 1911, P. L. 756, 822, 52 PS sec. 1251": *Haywood v. Henrietta Coal Co. et al.*, 118 Pa. Superior Ct. 371, 180 A. 34.

We adjudge section 301(b) of Act No. 323 as being unconstitutional in that it goes beyond the power delegated to the legislature on this subject-matter.

Section 8 of Act No. 552, i.e., the Act of July 2, 1937, P. L. 2714, known as the "Occupational Disease Compensation Act," which is expressly made a supplement to the Workmen's Compensation Act of 1915, provides: "In any action brought after the effective date of this act in any court by an employee against his employer who has elected not to be bound by the provisions of Article III of the Workmen's Compensation Act, and such action is based upon a claim by the employee for damages for personal injury resulting from an occupational disease, proof on the part of the employee that he had been subjected to a physical examination by such employer and that he had been discharged by such employer within one year after such examination, or proof of discharge by such employer and the further fact that the employee was unable to secure other employment within six months of the date of such discharge by reason of the presence of an occupational disease in any stage, shall be prima facie evidence of negligence on the part of such employer. In any such action it shall not be a defense

on the part of any employer—(a) That the injury was caused in whole or in part by the negligence of a fellow employee; or (b) That the employee had assumed the risk of the employment; or (c) That the injury was caused in any degree by the negligence of such employee; or (d) That the employee was exposed to the hazard of such disease in any other employment more than two years prior to the date of such action. The Statute of Limitations in any such action for personal injury resulting from an occupational disease shall commence to run from the date of the last exposure to the hazards of such disease in the employment of the defendant."

Section 201.1 of Act No. 20, approved September 29, 1938, amending Article II of the Workmen's Compensation Act of 1915, provides as follows: "In any action brought to recover damages for personal injury to an employee in the course of his employment or for death resulting from such injury, the following legal presumption, the rules for admitting certain evidence and the amount of damages which can be recovered, shall apply: (a) When injury results to an employee in the course of his employment, it shall be presumed that the employer's negligence caused said injury, which presumption may be rebutted by the employer, and both the injured employee and the employer will be permitted to introduce testimony showing the cause of said injury. The final determination in all cases shall be a question of fact for the jury. (b) When an employee sustains an injury in the course of his employment, declarations, remarks and utterances made by the injured employee within twelve hours after the injury was sustained shall be admissible as competent evidence. (c) If the jury finds that the employee's injury was caused, or contributed to, by the employer's violation or failure to observe any safety law or regulation in effect at the time of the injury, the injured employee or his dependents shall be entitled to double damages."

472

The foregoing sections of the two acts referred to, both of which are parts of the Workmen's Compensation Act of 1915, *as now amended*, bring before us the question, inter alia, of "presumptions" and the power of the legislature to create them. The due administration of justice depends in large measure on the proper use of presumptions. For example, in a criminal case, for a court to fail to charge a jury that the defendant was presumed to be innocent until proved guilty beyond a reasonable doubt, is reversible error: *Com. v. Deitrick*, 218 Pa. 36, 66 A. 1007; *Com. v. Greene*, 227 Pa. 86, 75 A. 1024; *Com. v. Wood et al.*, 118 Pa. Superior Ct. 269, 179 A. 756; *Miklencic v. U. S.*, 62 Fed. (2d) 1044.

The right of the legislature to create procedural presumptions has been recognized, subject to the limitation that "there is some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate": *Mobile, J. & K. C. R. R. v. Turnipseed, Admr.*, 219 U. S. 35, 43. Justice HOLMES, speaking for the Supreme Court of the United States, reiterated this principle in *McFarland, Supervisor, v. American Sugar Refining Co.*, 241 U. S. 79. He also said: "As to the presumptions, the legislature may go a good way in raising one or in changing the burden of proof, but there are limits. . . . The presumption created here has no relation in experience to general facts. . . . The act must fall." Chief Justice HUGHES repeated the same principle in *Bandini Petroleum Co. et al. v. Superior Court*, 284 U. S. 8, and added: "The legislative presumption is invalid when it is entirely arbitrary, or creates an invidious discrimination, or operates to deprive a party of a reasonable opportunity to present the pertinent facts in his defense." He upheld the presumption in that case because, as he said, "there is a manifest connection between the fact proved and the fact presumed." In *Western & Atlantic R. R. v. Henderson*, 279 U. S. 639, 641-2, the Supreme

Court of the United States held that a state statute of
Georgia which, upon a mere fact of a collision between a
railway train and a vehicle at a highway grade crossing
and resulting death, raises a presumption that the rail-
way company and its employees were negligent is un-
reasonable and arbitrary and violates the due process
clause of the Fourteenth Amendment. In that case, Mr.
Justice BUTLER, speaking for a unanimous court, said:
"Legislative fiat may not take the place of fact in the
judicial determination of issues involving life, liberty or
property. . . . The mere fact of collision between a
railway train and a vehicle at a highway grade crossing
furnishes no basis for any inference as to whether the
accident was caused by negligence of the railway com-
pany or of the traveler on the highway or of both or
without fault of anyone. Reasoning does not lead from
the occurrence back to its cause." In *Watkins v. Pru-
dential Ins. Co.*, 315 Pa. 497, 173 A. 644, we discussed
the origin and use of presumptions in the administra-
tion of justice, and said: "Presumptions arise as fol-
lows: They are either (1) a procedural expedient, or
(2) a rule of proof production based upon the compara-
tive availability to the respective parties, of material
evidence, or (3) a conclusion firmly based upon the gen-
erally known results of wide human experience, or (4) a
combination of (1) and (3)." Unless a presumption is
a *necessary* procedural expedient, such as, e. g., the pre-
sumption as to which spouse survives a fatal accident
common to both husband and wife or unless it is a rule
of proof production based upon the comparative avail-
ability of material evidence to the respective parties, in
which the presumption is against that party who in-
vokes in his defense a privilege easily susceptible of
proof, such as, for example, a license to sell liquor, the
presumption must be "a conclusion firmly based upon
the generally known results of wide human experience."
We said further in that case: "It is obvious that what
are originally mere inferences may in time become pre-

sumptions of law. If, for example, 'in the beginning,' 100 human beings had been created, and sometime later 51% or more had died, there would then have arisen an inference that all men are mortal. Later in the course of time with additional data all supporting the same inference, it would become a presumption of law that all men are mortal. Judge BALDWIN of the Supreme Court of Errors of Connecticut has admirably characterized the nature of presumption as follows, in *Ward v. Metropolitan Life Ins. Co.*, 33 A. 902, 904: 'The term "presumption" is used to signify that which may be assumed without proof, or taken for granted. . . . It is asserted as a self-evident result of human reason and experience. In its origin, every presumption is one of fact, and not of law. It may, in course of time, become a presumption of law, and even an indisputable one. Its truth may be so universally accepted as to elevate it to the position of a maxim of jurisprudence.' "

When the legislature attempts to create presumptions which are *not* necessary as procedural expedients and are *not* rules of proof production based upon the comparative availability to the respective parties, of material evidence, and are diametrically opposed to the generally known results of wide experience, such presumptions are entirely arbitrary and are therefore invalid. The presumptions legislatively created by the challenged acts clearly fall within the category just described.

Proof, as provided in section 8 of the Occupational Disease Compensation Act No. 552, (1) that an employee had been subjected to a physical examination by his employer, (2) that he had been discharged by such employer within one year after such examination, *or* proof (1) of discharge by such employer and (2) that he was unable to secure other employment within six months of the date of such discharge by reason of the presence of an occupational disease in any stage, furnishes no logical or reasonable basis for a prima facie inference of negligence on the part of such employer.

Defendant argues: "Prima facie evidence of negligence is merely equivalent to an inference of negligence which disappears when contrary testimony is introduced." The answer to that is, if no contrary testimony is introduced, the prima facie evidence stands.

Likewise, proof that injury resulted to an employee in the course of his employment furnishes no logical or reasonable basis for an inference of negligence on the part of such employer, and the presumption prescribed in section 201.1 of Act No. 20 is therefore arbitrary and invalid. It is an attempt to make conjecture serve as proof. It would be equally reasonable to declare by statute that a criminal accusation is presumptive proof of guilt.[3] When mere conjectures are by legislative fiat accepted in courts of justice as substitutes for facts and reasonable inferences, our trials will invite the characterization the then leader of the American Bar in 1898, Joseph H. Choate, publicly applied to the trial of Emile Zola, which had just taken place in France: "It *purported* to be a jury trial, but for reckless disregard of every principle of right and justice, it is without a precedent in modern history." The courts in their expositions of that fundamental guarantee of "due process of law," by which *in this country* every individual's life, liberty and property are shielded, have again and again declared that the power of legislatures is limited and that the guarantee of "due process of law" operates as a practical restraint upon their arbitrary actions. It is a constitutional function of the American judiciary to protect life, liberty and property against highhanded or capricious official invasions operating under legal *forms*. In *Ex Parte Milligan*, 4 Wall. 2, the judiciary faithful to its constitutional responsibilities and heedless of the

---

[3] To paraphrase what Justice LUMPKIN, speaking for the Supreme Court of Georgia, said in *Griffin v. State*, 142 Ga. 636, 9: "If the legislature should declare that every man found wearing a straw hat in September" presumably stole it, "such an act would be invalid" as "the presumption would be purely arbitrary."

plea of "military necessity" saved the lives of men upon whom the penalty of death had been imposed under a procedure *in form lawful* but *in its essence lawless*. In *Loan Association v. Topeka,* 87 U. S. 655, 665, the Supreme Court denounced arbitrary decrees "under legislative forms" and said: "To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals . . . is none the less a robbery because it is done under the forms of law." In that case the court, speaking through Justice MILLER, said further: "It must be conceded that there are such rights in every free government beyond the control of the State. A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is nevertheless a despotism. It may be doubted, if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness and the security of which is essential to that happiness, under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man than by many." In *Murray's Lessees v. Hoboken, etc.,* 18 How. 272, 276-7, the United States Supreme Court said: "The Constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It is manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave Congress free to make any process 'due process of law' by its mere will. To what principles are we to resort to ascertain whether this process enacted by Congress is

due process?   To this the answer must be twofold.· We must examine the Constitution itself to see whether this process be in conflict with any of its provisions.   If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."   In *Jones v. Robbins,* 8 Gray 329, Chief Justice Shaw of Massachusetts declared that by the phrase, "Law of the land," taken from Magna Charta and embedded in the Constitution of Massachusetts, was meant "the ancient established law and course of legal proceedings, by an adherence to which our ancestors in England, before the settlement of this country, and the emigrants themselves and their descendants had found safety for their personal rights."

In *Truax v. Corrigan,* 257 U. S. 312, the Supreme Court of the United States, in an opinion by Chief Justice Taft, said: "No one has a vested right in any particular rule of the common law, but it is also true that the legislative power of a State can only be exerted in subordination to the fundamental principles of right and justice which the guaranty of due process·in the Fourteenth Amendment is intended to preserve, and that a purely arbitrary or capricious exercise of that power whereby a wrongful and highly injurious invasion of property rights, as here, is practically sanctioned and the owner stripped of all real remedy, is wholly at variance with those principles. . . . When fundamental rights are thus attempted to be taken away, however, we may well subject such experiment to attentive judgment. The Constitution was intended, its very purpose was, to prevent experimentation with the fundamental rights of the individual."   In *Bank of Columbia v. Okely,* 17 U. S. 235, the Supreme Court said in reference to the 21st article of the Declaration of Rights of the State of Mary-

land: "No freeman ought to be taken or imprisoned, etc., or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land," that: "As to the words from Magna Charta, incorporated into the constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at length settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice."

In Cooley's "Constitutional Limitations" (8th ed.), Vol. 2, p. 737, it is said: " 'Due process of law' does not mean 'the general body of the law, common and statute, as it was at the time the Constitution took effect; for that would deny to the legislature the power to change or amend the law in any particular. Neither, on the other hand, does 'the law of the land' or 'due process of law' mean anything which the legislature may see fit to declare to be such; for there are certain fundamental rights, which our system of jurisprudence has always recognized, which not even the legislature can disregard in proceedings by which a person is deprived of life, liberty or property. . . . Although the legislature may at its pleasure provide new remedies or change old ones, the power is nevertheless subject to the condition that it cannot remove . . . certain fundamental rights which have been always recognized and observed in judicial procedures." Cooley quotes from Broom's Constitutional Law, page 228, as follows: "It is indeed an essential principle of the law of England, 'that the subject hath an undoubted property in his goods and possessions; otherwise there shall remain no more industry, no more justice, no more valor; for who will labor? who will hazard his person in the day of battle for that which is not his own? The *Banker's Case,* by Turner, 10."

In *Norman v. Heist,* 5 W. & S. 171, Chief Justice GIB-SON of this court refers to the oath which members of the legislature have to take "to support the Constitution, which declares that no citizen shall be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land. . . . The design of the convention was to exclude arbitrary power from every branch of the government; . . . The right of property has no foundation or security but the law; and when the legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen will be no more."

Daniel Webster in his argument in the *Dartmouth College case* (4 Wheat. 519), declared: "The meaning [of the phrase, 'law of the land'] is that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. Everything which may pass under the form of an enactment is not therefore to be considered the law of the land. If this were so, . . . acts of confiscation . . . and acts directly transferring one man's estate to another . . . would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance completely inoperative and void. It would tend directly to establish the union of all powers in the legislature. There would be no general, permanent law for courts to administer or men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative judgments and decrees; not to declare the law or to administer the justice of the country. 'Is that the law of the land,' said Mr. Burke, 'upon which, if a man go to Westminster Hall, and ask counsel by what title or tenure he holds his privilege or estate *according to the law of the land,* he should be told, that the law of the land is not yet known; that no decision or decree has been made in his case; that when a decree shall be passed, he will then know *what the law of the land is?*

Will this be said to be the law of the land, by any lawyer who has a rag of a gown left upon his back, or a wig with one tie upon his head?' "

The following cases typify the protection the United States Supreme Court has accorded persons who invoked the due process clause of the federal 14th Amendment. In *Pierce, Governor of Oregon, v. The Society of Sisters,* 268 U. S. 510, a law of Oregon, which forbade sending children between 8 and 16 years of age to parochial schools or any other schools other than public schools, was declared invalid. In *Meyer v. Nebraska,* 262 U. S. 390, a law restricting the teaching of any foreign language in the public schools was declared invalid. In *Yick Wo v. Hopkins,* 118 U. S. 356, an alien Chinese laundryman of San Francisco invoked successfully the "due process" clause against the arbitrary and oppressive acts of city officials done under forms of law. In *Brown v. Mississippi,* 297 U. S. 278, the Supreme Court set aside the death penalty which had been imposed on Negro defendants whose confessions had been obtained by force and violence. In *Powell v. Alabama,* 287 U. S. 45, the Supreme Court set aside the death sentence which had been imposed on Negro defendants who had been denied "the guiding hand of counsel at every step in the proceedings." In *U. S. v. Lee,* 106 U. S. 196, the Supreme Court ordered the national government to restore to the heirs of General Robert E. Lee the estate at Arlington which it had seized during the Civil War. In *Grosjean v. American Press Co.,* 297 U. S. 233, the Supreme Court maintained the freedom of the press which had been throttled by a state law passed by a legislature subservient to the orders of a political dictator. In *Near v. Minnesota,* 283 U. S. 697, it likewise vindicated the freedom of the press. In *Morrison v. California,* 291 U. S. 82, the Supreme Court declared invalid, as a denial of due process of law, a state statute which placed the burden of proving citizenship or eligibility of citizenship upon defendants who were alleged to be aliens

and as such to be attempting to evade the alien land law of California. The court, speaking through Justice CARDOZO, said in effect: In the case of the white lessor, the statutory presumption of a lessee's disqualification and the lessor's knowledge of it, based on lease and possession, is arbitrary; in the case of the Japanese lessee, the shifting of burden of proof is unjustifiable because the lease of agricultural land conveys no hint of criminality, and because there is no practical necessity of relieving prosecution from proving Japanese race.

In the light of reason and of these authoritative cases, we have no hesitancy in declaring section 8 of Act No. 552, i. e., the Act of July 2, 1937, P. L. 2714, the "Occupational Disease Act," and section 201.1, subsection A of Act No. 20, approved September 29, 1938, amending Art. II of the Workmen's Compensation Act of 1915, invalid, as contravening (1), section 9 of Article I, the Bill of Rights, of the Constitution of this Commonwealth, which section declares, inter alia, that no person can "be deprived of his life, liberty or property unless by the judgment of his peers or the law of the land," and (2) the 14th Amendment to the Constitution of the United States which declares, inter alia, that no state shall "deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

We will now consider subsection B of section 201.1 of Act No. 20 (supra) which provides that "when an employee sustains an injury in the course of his employment, declarations, remarks and utterances made by the injured employee within 12 hours after the injury was sustained shall be admissible as competent evidence."

This is an extraordinary provision and nothing like it has ever before been placed on the statute books of Pennsylvania. If there is any such statute in any other state, it is not cited in the comprehensive brief of counsel who are attempting to uphold the challenged acts. The provision quoted (201.1 B) means that anything an in-

jured employee says within 12 hours after the injury, to anybody, shall be adjudged "competent evidence" in any action brought to recover damages for personal injury to that employee. Even though the injured employee be living at the time his action is tried his "within-12-hours" declaration is "competent evidence." This is so whether he takes the witness stand or whether he does not. Even though A, the employee, wilfully made to B, a false statement about the injury or its cause and the false statement was repeated in court by B, neither could be prosecuted for perjury, for A did not make his statement under oath and B only repeated under oath what A *had told* him. A might not even be present in court when his case was tried. He might absent himself beyond the jurisdiction of the court and depend on his attorney "making out a case" for him by calling witnesses to whom he had made declarations within twelve hours after the injury. Under those circumstances A could not even be called "as for cross-examination" and interrogated about his "within-12-hours" statements, and if he had died, it would mean that "evidence" was received which, while not possessing the avouchment of truthfulness which the solemnity of dying declarations and the spontaneity of a res gestæ declaration provide, was also not subjected to the test of cross-examination. Courts have repeatedly held that cross-examination is not a privilege but a right. Chief Justice GIBSON said in *Bank v. Fordyce,* 9 Pa. 275, 277 : "A party is entitled to bring out every circumstance relating to a fact which an adverse witness is called to prove." Wigmore on Evidence (2d ed.), Vol. 3, p. 26, sec. 1367, says: "For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination . . . has found increasing strength in lengthening experience. . . . It is beyond any doubt

the greatest legal engine ever invented for the discovery of truth." Chief Justice MARSHALL in *Queen v. Hepburn,* 11 U. S. 290, 296, speaking for the Supreme Court of the United States, said: "The danger of admitting hearsay evidence is sufficient to admonish courts of justice against lightly yielding to the introduction of fresh exceptions to an old and well established rule, the value of which is felt and acknowledged by all."

The section in question does not require that "declarations, remarks and utterances," which are statutorily declared to be "competent evidence," relate to the injury. For all that appears in the act, they might consist of a prejudicial attack on the employer-plaintiff. Ex parte declarations made by an employee "within 12 hours after the injury" have no probative value whatsoever, for (1) they are not made under the safeguard of an oath, (2) they do not possess the spontaneity of res gestæ declarations, these latter being "a spontaneous and sincere response to the actual sensations and perceptions produced by the shock," and made before considerations of self-interest have had an opportunity to affect the statements of the victim (see *Com. v. Fugmann,* 330 Pa. 4), (3) they are not made under the solemnity of the consciousness of impending death, as are dying declarations, and (4) they are not subject to the test of cross-examination. Even res gestæ and dying declarations are not competent evidence when, tested by the standards of legal evidence, the substance of them is found to be incompetent *(Com. v. Fugmann,* supra). Since the "declarations, remarks and utterances made by the injured employee within 12 hours after the injury was sustained" possess no probative value, for the reasons stated, their admission in the trial of an action at law violates the first of what Thayer in his Preliminary Treatise on Evidence at the Common Law declares (p. 530) to be "the two leading principles of evidence (1) that nothing is to be received which is not logically probative of some matter required to be proved. . . ."

Not even an act of legislation can give probative value to a statement that has none. The legislature has no control over the laws of logic. This court said as long ago as 1803 that "rules of evidence are founded in reason and good sense" *(Galbreath et al. v. Eichelberger,* 3 Yeates 515).

Wigmore (sec. 4, Vol. 1, Evidence, 2d ed.) points out that "the rules of admissibility are in general the same for the trial of civil and of criminal cases. Not only in practice, but in principle and in spirit, there is no occasion for a distinction. The relation between the evidentiary fact and a particular proposition is always the same." Suppose the "proposition" to be established by legal evidence was that B committed a certain crime? What would the people think of a statute which made "competent evidence" against B, something A had said within 12 hours after the alleged crime and which was not said under the sanctity of an oath, and subject to the test of cross-examination, and was not said under circumstances which made it a dying declaration or a res gestæ declaration? The framers of the Constitution were so fearful of even the possibility of such a thing that they provided in the Bill of Rights (sec. 9) that in all criminal prosecutions the accused "has a right to meet the witnesses face to face." It was apparently never contemplated by those who framed and the people who adopted the Constitution that in civil actions (in which vastly more persons are directly concerned than are concerned as defendants in criminal cases), it was necessary to safeguard against arbitrary legislative action long-established rules of evidence other than in the general language of the Constitution which provides that "trial by jury shall be as heretofore" and that no person can be deprived of life, liberty or property ". . . unless by the law of the land" (sections 6 and 9, respectively, of the Bill of Rights).

Not only does the section in question attempt to clothe with the attribute of probative value something which

has none, but it possesses from the constitutional point of view an even more obviously fatal defect in that (1) it applies *only* to actions for damages in which "employees injured in the course of employment" are plaintiffs. All *other* plaintiffs in actions for damages, such as, e. g., the tens of thousands of victims of automobile accidents, cannot invoke this section in behalf of the "competency" of "declarations, remarks and utterances made" by *them* "within twelve hours after" *their* injuries were sustained; (2) even in actions for damages brought by "employees injured in the course of employment," the benefit of this radical rule of evidence prescribed by section 201.1 B is denied to the *defendant*. There has never come to our attention any other instance of a lawmaking body attempting to *open* the door of "loose hearsay testimony" for the benefit of *one* party to litigation while keeping it *closed* to the *other*. Because of the discriminatory character of this rule, if there was no other reason, the section creating it is invalid.

We recognize the right of the legislature to create or alter rules of evidence. But this power is subject to these limitations: (1) It is at least doubtful if the legislature can, under the guise of creating a "rule of *evidence*," make something evidence which is in fact *not* evidence, (2) If in fact the legislature is attempting to regulate a rule of evidence, "its regulation must be impartial and uniform": Cooley on Constitutional Limitations, 8th ed., Vol. 2, p. 768. That learned jurist said further (p. 769) : "In judicial investigations the law of the land requires an opportunity for a trial, and there can be no trial if only one party is suffered to produce his proofs." The corollary of this is that there "can be no trial" in the proper acceptation of that word, if one party is permitted to introduce "hearsay testimony," and the opposing party is not. Judge COOLEY'S statement of the principle above cited was reiterated by the Supreme Court of Kansas in *Missouri, K. & T. Ry. Co.*

*v. Simonson et al.,* 68 Pac. 653. That case decided that a state law which makes the specification of weights in bills of lading issued by railroad companies for hay, grain, etc., shipped over their lines conclusive evidence of the correctness of such weights, is unconstitutional because denying to the companies due process of law, and because wrongfully depriving the courts of the judicial power to determine the weight and sufficiency of evidence.

The legislature cannot make any fact conclusive proof of a fact in issue.[4] While there is, of course, a logical distinction between making a fact *conclusive proof* of a fact in issue and making an unsworn utterance of an injured employee "competent evidence," in support of his claim, yet in *practical effect* this latter provision makes a finding of an employer's *fault* almost inevitable from the mere fact of an employee's injury. In respect to a large percentage of injuries to employees there are no witnesses except the employee himself; therefore, if *anything* he says to any person or persons within 12 hours of his injury is to be received in court as *competent evidence,* an employer's right of *rebuttal* would be practically valueless, and he would scarcely be in a more helpless position to defend himself against liability if the legislature decreed that the mere *fact* of an employee's injury should be taken as *conclusive proof* of his *employer's fault.*

Section 201.1 B of Act 20 not only contravenes the principle that rules of evidence must be uniform and impartial, it also breaches that provision of section 7 of Article III of the State Constitution, reading as follows: "The General Assembly shall not pass any local or special law . . . regulating the rules of evidence in any judicial proceeding or inquiry before courts. . . ."

---

[4] *McCready v. Sexton & Son,* 29 Iowa 356; *Allen v. Armstrong,* 16 Iowa 508; *Wantlan v. White,* 19 Ind. 470; *White v. Flynn,* 23 Ind. 46, and *Groesbeck v. Seeley,* 13 Mich. 329.

In support of the constitutionality of paragraph B of section 201.1 of Act No. 20, counsel for the defendant cites the case of *Com. v. Newhart,* 97 Pa. Superior Ct. 216. In that case it was decided that section 4 of the Act of June 30, 1923, P. L. 982, which provides that when a person is tried on the charge of maintaining a bawdy house, testimony concerning the reputation of the house in question and of the persons who reside in it and of the defendant shall be admissible in support of the charge, was not invalid as special legislation because "it applies alike to the trial of all prosecutions in which the particular crime is charged" (quoting from President Judge RICE in *Com. v. Winkelman,* 12 Pa. Superior Ct. 497). The act here challenged does not apply to all actions brought to recover damages for personal injury, but *only* to those of such actions which are brought by employees injured in the course of their employment and applies to *only one party* in such an action, to wit, the *plaintiff.* In the Winkelman case the defendant's *inherent* right to offer rebuttal testimony showing the *good* repute of himself and his house, put him and his accuser *on the same footing* in respect to reputation testimony, whereas in the act before us testimony as to the employee's "declarations, remarks and utterances," made within twelve hours after the injury, is admissible as "competent evidence" while similar ex parte remarks made by the employer would, of course, be excluded as *hearsay.* Defendant also quotes the comments of President Judge KELLER of the Superior Court in *Nesbit v. Vandervort & Curry et al.,* 128 Pa. Superior Ct. 58, 193 A. 393, as to "the liberality in the admission of proofs" in Workmen's Compensation cases and that "where the facts are sufficiently established by circumstantial evidence, hearsay testimony *not inconsistent therewith,* if *relevant and material to the fact in issue* [italics supplied] may be considered for the additional light if any, that it throws on the matter." This case obviously lends no support to defendant's contention here. No rule as

to "hearsay testimony" was there laid down *for one party only* and the hearsay testimony had to be "relevant" and "material" and "not inconsistent" with the other testimony, and the action was not an action at law *but was under the Workmen's Compensation Law, to which both employer and employee had voluntarily submitted*. The defendant also quotes from President Judge KELLER's opinion as follows: "The strict rules of evidence should not be insisted upon too rigorously, to the exclusion of a just claim. Otherwise, the legislature, on the ground of necessity, may feel obliged to relax the hearsay rule so as to permit the admission of declarations made by the deceased, within a reasonable time and under circumstances that negative premeditation and design, to his wife and family upon his return home." Judge KELLER was obviously referring to a possible change of the rules of evidence in proceedings under the Workmen's Compensation Law (which law either the employer or employee did not *have* to submit to), and not to proceedings in actions at law as does Act No. 20, and the only "relaxing" of the "hearsay rule" he suggested even in Workmen's Compensation cases was one which would admit declarations made by the *deceased* within a reasonable time and under circumstances that negative premeditation and design, to his wife and family upon his return home. Act No. 20 makes admissible in *actions at law* declarations made by any injured employee, whether he lives or dies, to anybody and within twelve hours after the injury. Twelve hours affords ample time for the "designing" of testimony. In the same case Judge KELLER said: "Awards in Workmen's Compensation cases cannot rest wholly on hearsay evidence (unless not objected to: *Poluski v. Glen Alden Coal Co.*, 286 Pa. 473, 476, 133 A. 819)." Under Act No. 20, it is possible for a plaintiff-employee in an action at law against his employer to make out his case wholly on hearsay testimony and no objection would avail him anything.

We adjudge paragraph B of section 201.1 of Act No. 20, approved September 29, 1938, to be invalid for its lack of uniformity and impartiality as a rule of evidence and because it is "special legislation" which contravenes section 7 of Article III of the State Constitution and because it is a denial of "equal protection of the laws" guaranteed by the 14th Amendment to the Constitution of the United States.

The members of this court are in complete accord with the social policy underlying Workmen's Compensation Acts. As Attorney General Bard said in his brief filed in this case: "No provision of any compensation act ever passed in Pennsylvania has ever been held unconstitutional and the basic validity of this act was upheld in *Anderson v. Carnegie Steel Corp.*, 255 Pa. 33, 99 A. 215." In the latter case, which is frequently referred to in defendant's briefs, this court decided that section 201 of Article II of the Workmen's Compensation Act of 1915, abolishing the fellow servant rule, assumption of risk and contributory negligence as defenses to recover damages for injuries sustained by an employee or for death resulting from injuries received in the course of employment, is not a taking of property without due process of law. If an employer's negligence is affirmatively established by evidence, it is *not* "arbitrary and unreasonable" to hold that he must answer for that fault even though the negligence of the employee's fellow servant or of the employee himself *contributed* to it. An analogous rule has immemorially prevailed in the criminal courts where a defendant must answer for his negligence even though the victim of it also was negligent. But in common law actions of tort, it is "the law of the land" that liability cannot be imposed upon one who is without fault. To *legislate* a person presumptively guilty of either a crime or a tort is an attempted erosion of "the substance of original justice."

The reasonableness of the compensation provided for in the Workmen's Compensation Act of 1915 has never

been questioned. However, when the rates and periods of compensation have been materially increased, and persons affected thereby have challenged these new statutes as unreasonable and otherwise invalid, it becomes the duty of the judiciary to pass on their constitutionality. The question of the reasonableness of compensation is analogous to the question of the reasonableness of rates permitted to be charged by railroads and public utility corporations. If the rates fixed by state administrative bodies prevent an adequate return on investment, they are adjudged to amount to a confiscation of the company's capital and property, and therefore to a denial of due process of law. As Justice CARDOZO said in *West Ohio Gas Co. v. Public Utilities Commission of Ohio (No. 1)*, 294 U. S. 63: "Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation." The Supreme Court of the United States said in *United Railways & Electric Co. v. West et al.*, 280 U. S. 234: "What will constitute a fair return in a given case is not capable of exact mathematical demonstration. It is a matter more or less of approximation about which conclusions may differ. The court in the discharge of its constitutional duty on the issue of confiscation must determine the amount to the best of its ability in the exercise of a fair, enlightened and 'independent judgment as to both law and facts.' "

The reasonableness of the compensation prescribed by statute must be determined by a consideration of the requirements of both employee and employer. The burden on the employer is not determined simply by the rate of compensation but by compensation multiplied by the number of times it has to be paid. A rate of compensation which would be a negligible burden to a great industry in which there were a comparatively small number of employees injured annually might be a crushing

burden to an equally great industry in which there were a comparatively large number of employees injured during an equal period of time. In judging the weight of the present and future economic burden of a compensation law, the past records of injuries in the industries affected must be one of the guides. Compensation rates which would be a light burden on industries in State "A" whose major industries offered mainly *non*hazardous employment, might be an intolerably heavy burden in State "B" whose major industries offered mainly *extra*-hazardous employment. This is illustrated in the table appended below[5] showing pertinent statistics in respect (1) to the automobile industry in the State of Michigan, and (2) to the coal industry in the State of Pennsylvania *for the year 1938.* In Michigan's major industry, automobile manufacturing, there were in 1938 only 14 fatal accidents; in Pennsylvania's major industry (or, at least, *one* of its major industries), coal mining, there were during the same period 332 fatal accidents. Even if the rates of compensation in any two states are anywhere near the same, *that* fact *standing* alone would throw little or no light on the problem of the reasonableness of the compensation here provided by a Workmen's Compensation Law. Just as in physics, momentum means mass multiplied by velocity, so the "momentum" with which a Workmen's Compensation Law bears down on industry depends on the compensation prescribed in *individual* cases multiplied by the *number* of cases in which the prescribed compensation is translated into dollars to be paid out of the product of the industry affected.

| [5] State | Number of Employees in Major Industry | Approximate Value of Annual Product | Fatal Accidents | Non-Fatal Accidents |
|---|---|---|---|---|
| Michigan .... | Auto Workers 226,327 | $1,250,000,000 | 14 | 3,119 |
| Pennsylvania | Mine Workers 213,831 | $400,000,000 | 332 | 17,459 |

If the compensation required by statute in Pennsylvania makes it impossible for Pennsylvania industries employing wage earners to continue to operate with a reasonable return on the property invested, such a compensation law would have to be adjudged unreasonable as respects those industries. If they normally employ a sufficient number of wage earners to make the destruction of those industries substantially harmful to the body economic of this Commonwealth, the statute in question would have to be adjudged as failing to meet the standard of reasonableness prescribed by Article III, section 21 of the Constitution. One of the most profoundly philosophical of statesmen, Edmund Burke, once said: "Every law which obstructs property is . . . in proportion to the force and extent of the obstruction, a discouragement to industry." (See footnote 6 at end of opinion.)

Except (1) the provision, *section 203*, of the *Act of June 4, 1937, P. L. 1552,* which makes an employer liable to the employees of subcontractors for injuries to such employees in the course of employment whether said injury occurred upon premises occupied or controlled by the employer or not, and except (2) that *part of paragraph B of section 301* of *the same act* which provides that violation of "any law or rule or regulation of the business or industry or a positive order of the employer at the time of the injury" shall not affect the employee's "right to receive compensation," and except (3) *section 8 of Act No. 552,* approved *July 2, 1937, P. L. 2714,* down to and *including* the phrase *"shall be prima facie evidence of negligence on the part of such employer,"* and except (4) subsection "D" of *section 8* of *that act,* which subsection "D" arbitrarily limits the factual defense which "due process of law" requires should be open to the defendant for whatever it may be worth as evidence, and except (5) the major portions of the Act of *September 29, 1938, P. L. 52, (Act No. 20),* to wit: Section *201.1* and *subsections A and B* next following section

201.1, and except (6) that provision of section *437* of *Act No. 323* which authorizes a lay member of a labor union to represent a claimant in litigating his claim (which provision Attorney General Bard in his oral argument conceded to be invalid), the Workmen's Compensation Acts of June 4, 1937, P. L. 1552, and July 2, 1937, P. L. 2714, and Act No. 20, approved September 29, 1938, P. L. 52, are *not* adjudged to be unconstitutional, but the questions as to the *reasonableness* of the compensation prescribed by them and *as to the validity otherwise* of their several provisions *are left open* for future judicial determination in appropriate proceedings in the court below, and on any appeal which may follow. All of the sections and subsections and provisions under the foregoing exceptions indicated as 1, 2, 3, 4 and 5, are by us unanimously adjudged to be invalid as contravening the Constitutions both of Pennsylvania and of the United States, as herein pointed out. Six is invalid under our decision in *Shortz et al. v. Farrell,* 327 Pa. 81. It is not necessary to decide *at this time* the other questions presented by this record and relating to the validity of the other provisions of these acts.

It should be noted that 3, 4 and 5, of these six excepted sections and provisions adjudged invalid relate solely to *actions at law* by employees against employers who, availing themselves of the elective rights accorded them by section 302 of the Workmen's Compensation Act of 1915, and amendments thereto, have in due form declared that the provisions of Article III of that act do not apply to the contracts of hiring made by them.

In defendant's paper book appears the following incontrovertible statement: "The system of workmen's compensation afforded to employers by the reënacted Workmen's Compensation Act and the 'Occupational Disease Compensation Act' is purely elective." It follows that if employers regard the compensation prescribed in Article III and its amendments and supplements as *unreasonable* and as casting upon them and

their industries an *insupportable* burden, they cannot, for exercising their right of rejection, be penalized by having their constitutional rights as *defendants in actions at law* taken away from them or abridged, for whatever rights are guaranteed them by the Constitution of Pennsylvania or by the Constitution of the United States are beyond the reach of legislative power.

The record is remitted to the court below for further proceedings in accordance with this opinion.

---

[6] The Pennsylvania legislature of 1937 created "The Industrial Tax Survey Committee," consisting of three senators and three representatives, "to make a careful, thorough and impartial investigation of the total tax burdens placed upon industry in Pennsylvania and other industrial and mining states and to report its findings and recommendations to the General Assembly." Senator John H. Dent of Westmoreland County was made Chairman of this Committee. In its comprehensive report recently filed and signed by the following members: Senators Dent and Gelder and Representatives Trout, Lovett, and Weiss, appear the following paragraphs which are pertinent to the subject-matter of this opinion:

### "MINING"

"Taxation and Workmen's Compensation rates appear to be two factors extremely harmful to both the anthracite and bituminous coal industries. . . . Both of these industries are in a desperate plight, probably worse than any other in the state. There is little question that wholesale bankruptcy faces this industry unless relief is forthcoming in the near future. Here is an industry which cannot physically migrate, but in the case of bituminous coal, its production can migrate. The operator who has coal lands in this and other states can shift his market from Pennsylvania. In the case of anthracite, no migration can take place but substitutes can replace this fuel and are doing so."

### "ANTHRACITE"

". . . The anthracite industry is equipped to produce 80,000,000 tons a year (normal production some years ago) but can now market only about 50,000,000 tons. In ten years during which this decline in production took place, the domestic consumption of coke has increased 400% and of fuel oil 1200%. These substitutes are slowly robbing anthracite coal of its market. The working capital of this industry has declined in the last twelve (12) years from $110,000,000 to less than $9,000,000. . . . The operators contended

that the 1937 Workmen's Compensation Act increased compensation costs approximately 107% (variations from 102% to 110%). Experience seems to indicate that the increase is about 110%. This increase does not include occupational disease compensation. The total increase, exclusive of occupational disease, is estimated by operators at $2,600,000 a year, as measured with the year 1934. This increase is due to the provisions of the 1937 compensation act which (a) increases the period for payment of compensation to dependents, (b) increases the period for payment of compensation for partial disability, and (c) increases the minimum compensation from $7 to $12 per week.

"The statement was made that operators producing more than one-half of the anthracite coal have rejected the new compensation act. More recent reports indicate this percentage has increased materially. The feeling prevails that it is cheaper to submit to suits for damages, without common law defenses, than to pay compensation under present laws. But such a procedure on the part of the small operator is deemed highly dangerous in case of a serious accident. Cases are now being settled at common law, without suit, on the basis of the former compensation law and agreements with miners to such a procedure is in force at some mines. Smaller companies are banding together in an endeavor to secure catastrophe insurance.

"When occupational disease compensation is fully operative, it is estimated by operators this will add another $2,600,000 to compensation costs. It is said that 23% of all anthracite employees are anthraco-silicotic and potential claimants under the occupational disease act.

"Illustrations of increases in compensation costs were laid before the committee in the form of actual bills rendered. These increases over rates for the year 1934 varied from $10.00 to $12.00, for each $100.00 payroll. In one case total compensation rates, exclusive of occupational disease, run as high as $30.00 per $100.00 of payroll.

"One operator testified he closed down one mine on account of this compensation cost and was going to close another in a few days, placing more families on relief. One witness, not an operator, referred to these compensation rates as 'suicidal' to the community, since the largest element of cost in a ton of anthracite coal is labor. The labor cost of producing a ton of coal is many times greater than the labor cost of producing an equal of BTU's of oil or coke. Compensation costs are consequently out of all proportion to those paid by producers of competing substitutes. . . ."

### "BITUMINOUS"

"The picture in the bituminous coal region is substantially the same as in the anthracite region. One mine employing 250 men in

1937 is delinquent in local taxes to the extent of $49,000 without calculating interest and penalties. This company has working capital of less than $35,000. Another mine employing 200 men owes $36,000, in local taxes and still another employing 150 men, $30,000. These companies are all in bankruptcy. They complain they 'can no longer meet West Virginia competition and depression prices.' These miners all face sales for delinquent real estate taxes.

"The thought was expressed that these mines might be rehabilitated if the state would lend 'a helpful hand by authorizing resettlement or compromise of taxes that have accrued during the years of the depression. We simply can't pay our taxes, we can't do it.'

"But even if a rehabilitation were attempted it was contended that existing taxes, compensation rates and wages made continuing operation difficult and perhaps impossible. Some operators have closed down Pennsylvania mines but are operating in West Virginia.

"One witness stated that wage rates in West Virginia were eight. (.08) cents a ton less than in Pennsylvania, taxes eight (.08) cents a ton less, and Workmen's Insurance from a minimum of eight (.08) to twelve (.12) cents a ton less, one witness made the differ-. ential sixteen (.16) cents a ton.

"While Pennsylvania production has lost in production approximately 80,000,000 tons in fifteen years, West Virginia has increased its tonnage 60,000,000 tons. in this same period. . . .

### "Clay Mining and Manufacturing"

"The only evidence produced relative to clay mining and manufacturing consisted of protests against the new compensation rates. One representative offered the following comparisons of old and new rates per $100 of payroll.

|  | Old Rate | New Rate |
|---|---|---|
| Clay mining | $5.712 | $9.991 |
| Clay manufacturing | 2.142 | 3.502 |

"The compensation costs on mining are alleged to amount to .20 cents a ton and on manufacturing .10 cents a ton. These two costs amount to 10% of the selling price, and are alleged to affect the production of Pennsylvania clay.

.     .     .     .     .     .     .     .     .     .     .     .     .

". . . Five companies contacted recently which desire to locate in the Harrisburg area, in each case, after careful consideration assigned taxes, compensation or restrictive labor legislation or all of them as making the location of industry here impossible. . . .

"At the Philadelphia hearing, your committee heard from representatives of the Chamber of Commerce and representatives of

manufacturers of rayon, farm implements and sleds, radios, textiles, carpets, cleaning and dyeing, steel shafting pulleys and pressed metal products, fertilizers and chemicals, technical instruments, iron products, automobile tires and paper boxes, in the Philadelphia area. Much direct testimony was given by which the harmful effects of Pennsylvania tax, compensation and other legislation was portrayed. . . .

"Restrictive or burdensome taxation is a deterrent to the location of any new industry and by its unsystematic burden on invested capital drives out working capital leading to lessened production and ultimate bankruptcy followed by greater unemployment. . . .

"The Commission recommends a complete and comprehensive study of workmen's compensation costs. The compensation set-up from the establishment of rates to the final disposition of cases is in need of complete revision. It is admitted that the coal industry in Pennsylvania carries the largest load of compensation costs and that a definite limitation should be placed upon the amount that can be charged for compensation on a per ton basis or a percentage basis similar to that in other States, thereby giving the coal industry an opportunity to successfully compete with coal operators in other States and aid in the rehabilitation of Pennsylvania as a mining state."

The plaintiffs, and the several intervening plaintiffs, filed a petition for reargument, in which the attorney general joined, praying the court to dispose of questions raised concerning the validity of sections 321 and 502 of the Act of June 4, 1937, P. L. 1552.

SUPPLEMENTAL OPINION ON PETITION FOR REARGUMENT
    KEPHART, C. J., April 15, 1939:
Section 502 of the Act of June 4, 1937, P. L. 1552, in permitting the Department of Labor and Industry to assess a charge upon "all employers" of the Commonwealth to pay for the cost of administering the Workmen's Compensation system and the Rehabilitation Act of July 18, 1919, P. L. 1045, offends the Constitution of this State in several particulars. Section 9 of Article I, prohibits the State from taking money from one individual and giving it to another, or using it for another's benefit, and from arbitrarily interfering with, taking or

confiscating private property. There must be some reasonable relation between the proposed act and the public good. Moreover, where classification is set up, as here, it must be reasonable and it must be necessary. All these requirements are violated.

It must be remembered that the Workmen's Compensation system is an elective system. Yet here employers who do not accept the Act's provisions or receive benefits from it, are brought within its operation, and made chargeable with a share of the cost of administering both the Workmen's Compensation and the Rehabilitation systems. Even assuming the assessments are to be made only upon such employers who accept the provisions of the Act, the constitutional guarantees of equal protection and the requirement of reasonable classification have been violated, since such employers receive no advantage from the Rehabilitation Act which does not accrue to all employers. All of the people of the State benefit in the Rehabilitation Act, and the cost of its administration as well as that of the Compensation system should not be imposed exclusively on employers who elect to come within the latter system.

In any event, if the assessments are upon employers regardless of their participation in the system, the section in reality provides for a tax (*Yosemite Lumber Co. et al. v. Industrial Accident Commission et al.*, 187 Cal. 774, 782-783; *The People v. Yosemite Lumber Co.*, 191 Cal. 267, 275-276), but it would be a tax levied in varying amounts at the discretion of the department. The legislature cannot delegate its power to tax to such a commission: *Wilson et ux. v. Phila. School Dist. et al.*, 328 Pa. 225; *Van Cleve v. Passaic Valley Sewerage Comrs.*, 71 N. J. L. 574; *People of Porto Rico v. Havemeyer*, 60 F. (2d) 10. Even if payment is to be made only by those who accept the act it would not be uniform, as the tax would be imposed on some members of a group without a corresponding imposition on other members of the same group. See *Ayars' Appeal*, 122 Pa.

266, 281; *Limestone Co. v. Fagley*, 187 Pa. 193 at 197. Such a discrimination is not proper classification. See *Schoyer et al. v. Comet Oil & Ref. Co.*, 284 Pa. 189; *State v. Lindsay*, 94 N. J. L. 357, 360; *The People v. Yosemite Lumber Co.*, 191 Cal. 267, 275-277.

We held in *Shortz et al. v. Farrell*, 327 Pa. 81, that the proceedings in Workmen's Compensation cases are essentially of a judicial character. Being such, the cost of administration should be assessed as in judicial proceedings, wherein the administrative expenses are borne by the State or the county or both, and the costs of trial are usually assessed against the litigants by the tribunal itself.

Section 321 of the Act of 1937, which seeks to compel employers or their insurance carriers to make a payment to the Commonwealth in the amount of $1,500 for the death of any employee leaving no dependents, if such employee's death would have been compensable had he been survived by dependents, is also unconstitutional. This sum of money is now directed by the legislature to be paid to the Commonwealth for various specified purposes. It might just as well, if such an imposition is legal, have diverted this money to any purpose it pleased. This section likewise actually provides for taxation, in violation of our equal protection and reasonable classification provisions (Article IX, section 1). It is a flat levy of a sum of money on one group of employers in the Commonwealth, from which all other employers are excluded. Considered as a tax it comes clearly under the condemnation of the Constitution for the reasons above set forth.

These two sections scarcely need any discussion. We hold both to be unconstitutional. This supplementary opinion is filed in connection with the petition for reargument and, as it answers the questions there raised, the reargument is refused.