Watson *v.* A. M. Byers Company et al., Appellants.

Argued April 24, 1940.

Before KELLER, P. J., CUNNING-HAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Ira R. Hill,* with him *John H. Sorg,* for appellants.

*Murray J. Jordan,* with him *Fred J. Jordan,* for appellee.

OPINION BY KELLER, P. J., June 24, 1940:

The decision of this workmen's compensation case depends on whether there is substantial, legally competent evidence in the record to sustain the findings of the compensation authorities, (1) that claimant's husband suffered an accident in the course of his employment on

March 23, 1937 and (2) that he died on July 9, 1937 as a result of that accident.

(1) The evidence as to the accident rests nearly altogether on hearsay declarations of the decedent. The legal question involved with regard to them is whether the declarations were within the recognized exception as to res gestae. Counsel for the claimant insisted at the hearing that the declarations were rendered admissible by the Act of September 29, 1938, No. 20, P. L. 52, which amended Article II of the Workmen's Compensation Act of June 2, 1915, P. L. 736, as re-enacted and amended by Act of June 4, 1937, P. L. 1552; but he overlooked that Article II of that Act related to actions at law for damages, not to claims for workmen's compensation; and since the hearing, section 201.1(b), relied on as making the declarations of the employee admissible, has been declared unconstitutional by the Supreme Court in *Rich Hill Coal Co. v. Bashore,* 334 Pa. 449, 481-489, 7 A. 2d 302. The admissibility of the declarations depends, therefore, on whether they came within the res gestae rule; and some statement of the facts is necessary to pass upon this point.

William E. Watson, claimant's husband, 69 years old, was employed by the defendant, A. M. Byers Company, to run the pumps in its pumphouse on the Monongahela River bank supplying water to the boilers and the mill, located between Sixth and Eighth Streets, Pittsburgh, Pa. He went to work about 9:00 o'clock A. M. and worked regularly until 4:00 o'clock P. M. His duties were to start the pumps, oil them occasionally and see that they kept running. He had no one working with him in the pumphouse. About ten minutes after 4:00 o'clock in the afternoon of March 23, 1937 his stepson, William Christy, who had gone to the *mill* to drive him to his home, saw him at the mill. As Watson walked over to get into the automobile Christy saw that he was limping and asked what was the matter, and he replied

that he had dropped a wrench on his foot at the pump-house. He did not tell Christy how long before it had occurred. When he got home he took off his shoe and started bathing his foot. His great toe was black and blue and bruised and inflamed. His wife, when she saw him limping, asked him what was wrong and he said a wrench fell on his toes about an hour before he left for home. She fixed hot water and salts for him and he bathed his foot. The next day he went back to work and continued to work until about a week before he went to St. Joseph's Hospital, which was on June 18, 1937. During the interval he was treated by Doctor A. M. Groves, the mill doctor. When he went to the hospital he got his own doctor, Doctor John O'Donnell, who treated him at the hospital until he died there on July 9th. Doctor O'Donnell testified (45a) that he "died from a thrombophlebitis [1] which extended from the great toe to the groin, which was precipitated by the *infection* in his great toe and which was made, of course, worse by his diabetes mellitus" (italics supplied) ; and at the same hearing in answer to the question, " Did the foot become gangrenous?" he testified (p. 46a) "Yes, the great toe became gangrenous but the cause of death was not the gangrene but the phlebitis infection which travelled along the vein through the toe to the large vein which goes along the thigh, the saphenous vein, and which finally went *into* the bloodstream ...... The direct cause of death here was thrombophlebitis, gangrene of the great toe, diabetes mellitus". At a later hearing, he read from the hospital records of St. Joseph's Hospital the history of the case as it was given on Watson's admission, as follows: "Chief complaint, gangrene of the great toe on the right foot. Present illness: Patient's great toe on the right foot began to pain. Shortly following, the toe became discolored and turned

---

[1] Thrombophlebitis refers to a clot that forms in a vein which is inflamed, plugging the vein.

black and was being treated by an outside physician, who discovered sugar in the urine and he was admitted to the hospital ...... On the 19th, the following admission note was made: Ingrown toenail was removed by family physician, failed to heal after seven weeks and this physician reported no glycosuria. Subsequent examination by me showed glycosuria two hours after food—negative, fasting. Blood sugar was 224 milograms per hundred c. c.'s of blood. Q. Doctor, does the hospital record show the cause of death there? A. Yes, that is—Q. Will you read that into the record also, please? A. Diabetic gangrene[2], Diabetes mellitus. Q. And that was according to your own information? A. Yes, that was my own record."

We have not recited the declarations alleged to have been made by Watson to his stepson, and to his wife, that he had gone to the dispensary after the accident to see the doctor and that the doctor was not there, or to his having reported the accident the next day to the doctor; nor the later declarations made to E. L. Stansbury and Mrs. Dorothy Beaver, concerning the accident or the treatment of his toe; all of which were relied on by the compensation authorities and the court below in deciding the case—for under no possible theory of res gestae can these declarations be held admissible. They were not spontaneous utterances accompanying or springing out of the accident or succeeding it so closely in time and place as to be a part of the occurrence and not the narrative of a past event *(Riley v. Carnegie Steel Co.,* 276 Pa. 82, 119 A. 832), but were concerning matters that occurred a *considerable time after the accident,* and were elicited in response to a series of questions, and clearly should have been excluded. The declara-

---

[2] Diabetic gangrene refers to the death of a part in a diabetic due to infection, or obstruction by degeneration of the blood vessels, common in diabetics.

tion to Christy, first above quoted, might have been admissible under the authorities—see, inter alia, those collated in *Broad Street Trust Co. v. Heyl Bros.*, 128 Pa. Superior Ct. 65, 70, 193 A. 397—if it had been made immediately after Watson first came out of the pumphouse following the accident, and Christy was the first person he then saw and spoke to—as to which there was not only no evidence but the declaration itself refuted it—for it later contained the statement that he had previously gone from the pumphouse to the Emergency Hospital or dispensary to see the doctor, but had not found him.

The declaration to the claimant made on his return home, relating to the accident, which he then told her had occurred an hour before he left for home, would seem to be ruled by the case of *Heite v. Vare Const. Co.*, 129 Pa. Superior Ct. 204, 195 A. 437, where a similar declaration made three-quarters of an hour after the employee had left his employer's premises was held inadmissible.

We are therefore of opinion that they did not come within the res gestæ rule and should have been excluded. They were probably received in evidence because of the provision in the Act of 1938, supra, which, as we have seen, was inapplicable and unconstitutional. There is, therefore, no substantial competent evidence in the record of the actual happening of the alleged accident.

(2) But even if these two declarations, as above quoted, had been admissible as part of the res gestæ— and they are all that could possibly have been so regarded—they would not rule the case in the claimant's favor, because the other circumstances in the case were such as to require medical testimony to connect the death with the alleged accident *(Anderson v. Baxter,* 285 Pa. 443, 132 A. 358; *Bunnell v. State Workmen's Ins. Fund,* 124 Pa. Superior Ct. 171, 188 A. 411; *Dorsch*

*v. Fisher Scientific Co.*, 136 Pa. Superior Ct. 197, 7 A. 2d 604), and this medical testimony is wanting.

Claimant's husband had diabetes mellitus. He also had an ingrown toenail on the right great toe. There can be no doubt of this, and the compensation authorities cannot disregard it. It appears in the history of the case furnished by Watson on his admission to the hospital, when he was suffering from diabetic gangrene in that toe. In fact it was the only history he then gave relating to its condition. He said nothing at that time of an accident to the toe. And his own family physician, Doctor O'Donnell, who testified as a witness for claimant, said, on direct examination: "At the time I first saw him, he had an *open wound* in his right great toe. There was a portion of the nail removed, about—I would say, about half an inch of the nail removed on the outer side of the great toe, leaving an open wound there. Q. And did you get a history from him of any cause of that? A. I got—on two occasions I got two different histories from him. At one time he said he had injured his toe, he didn't tell me at what time or how he had injured it, and another time I had a history of having an ingrown toenail removed by a physician ...... He told me Doctor Groves had removed a portion of the nail."

Doctor Groves, testifying as a witness for defendant, said that Watson had come to him on the *morning* of March 23, 1937 at 10:30 o'clock and asked him to look at his toe. On taking off the shoe, the doctor found an ulcer about an inch and a half wide and three-quarters of an inch long associated with ingrown toenail, and that the type of ulcer suggested diabetes mellitus, which later laboratory reports proved to be the case; that Watson was treated by him in his office from March 23 to May 18, receiving thirty-nine treatments, which included debridement [3] of the ulcer, proper antiseptics,

---

[3] "Debridement—Operation of removing by an incision any part which causes obstruction or prevents escape of pus" Webster's New International Dictionary.

suitable dressings and some heat treatments. He did not remove the nail at once but trimmed it the second day. It was not removed the first day because of the degree of infection which was already present. He said that Watson at no time made any report to him of any trauma or *injury* to the toe, or that a wrench had fallen on the toe. The foreman of defendant's machine shop (D. C. Dewald) who seems to have been Watson's immediate superior, also testified that on the *morning of March 23, 1937* he had sent a man to the pumphouse to relieve Watson so that the latter could go to the Emergency Hospital for treatment and that he had continued to send a man to the pumphouse for an hour *every morning* until May 18, so that Watson could be treated at the hospital. He also testified that Watson had never reported any injury to him.

We do not cite these as facts in the case, for the referee and the board were not bound to accept them—notwithstanding they seem to us to be consistent and worthy of belief—but as showing that nothing was developed in the defendant's case—as sometimes happens —which supported the findings of the referee and board. The referee, board and court were to some extent, at least, influenced in rejecting Doctor Groves' testimony by the inadmissible declarations of the employee testified to by Christy and the claimant that shortly *following* the injury he had gone to the dispensary to see the doctor and had not found him in.

The open wound, caused by the removal of part of the ingrown toenail, would furnish a port of entry for the infection that resulted in the thrombophlebitis, which in conjunction with the diabetic gangrene in the great toe, caused Watson's death. But if caused in this way his death would not be compensable for it would not have resulted from the accident.

On the other hand, if he had the accident as alleged in his declarations, and the skin was broken by it, so as

to furnish a port of entry for infection—of which, however, there is no testimony, the evidence being that the toe was black and blue and bruised and inflamed, but not cut or open—and this infection resulted in the thrombophlebitis, which in conjunction with the diabetic gangrene in the great toe caused his death, it would be compensable.

But, in such circumstances, as the death might be ascribed to either one of two contributing causes, only one of which was accidental and compensable, there would have to be competent medical evidence presented by a physician definitely stating that in his opinion the thrombophlebitis was caused by or resulted from the blow from the wrench, as over against the infection at the site of the ingrown nail.

Paying no regard to the evidence of Dr. Groves, who testified for the defendant, and confining ourselves to the testimony of claimant's witness, Doctor O'Donnell, who was Watson's own physician, we are of opinion that it fails to supply the necessary definite evidence.

At places, under the skillful examination of claimant's counsel, he gave testimony which might seem to supply the requisite proof, but it developed later that he was evidently referring to a case of supposed injury unconnected with the infected ingrown toenail; for his final declarations on the subject were:

"Q. What was the direct cause of death here, Doctor? A. The direct cause of death here was thrombophlebitis, gangrene of the great toe, diabetes mellitus. Q. Could you tell, Doctor, whether or not this came on as a result of trauma or ingrown toenail which you found to be partly removed when he first came to you? A. No, I couldn't tell. Q. But death could result from either one? A. Either cause. Q. Either cause? A. Yes. Q. And you aren't in a position to say which really caused death? A. No." [47a],
and again:

"Q. Doctor, can you yourself definitely say whether a trauma of the toe or the ingrown toenail with infection development caused death? A. No." [74a].

We have omitted the hypothetical question propounded to Doctor O'Donnell by Mr. Jordan (74a) and his answer (75a), because the question was based on the inadmissible testimony of Mr. Stansbury and others concerning declarations made long after the accident, which counsel thought were made admissible by the Act of 1938, supra, and on assumptions as to the date on which Watson first saw Dr. Groves, which were not warranted by the competent evidence in the record.

We can come to no other conclusion from the whole of the competent evidence in the case than that, at its conclusion, Doctor O'Donnell was not able to state as his professional opinion that the thrombophlebitis from which Watson died resulted from an accidental injury to his foot as over against the infection from the ingrown toenail; and this being so, for the reasons above stated, the award and judgment cannot stand.

We think it proper to say that although the alleged accident occurred on March 23, 1937 and Watson was unable to work from about June 11, 1937, no claim for compensation was presented by him during his lifetime, or until a week after his death on July 9, 1937.

The judgment is reversed and the award is set aside.