Rich Hill Coal Company et al., Appellants, *v.*
Chesnut, Secretary of Labor and
Industry, Appellant.

14

Argued April 13, 1945; reargued April 16, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*M. Louise Rutherford,* Deputy Attorney General, with her *James H. Duff,* Attorney General, and *Orville Brown,* Deputy Attorney General, for Secretary of Labor and Industry.

*David L. Ullman,* for petitioners to intervene.

*A. Evans Kephart,* with him *Roger J. Dever* and *John W. Kephart, Jr.,* for intervenor, United Mine Workers of America.

*George Wharton Pepper,* with him *John D. M. Hamilton, William A. Schnader, Bernard G. Segal, Louis F. Folge, John E. Muller, Pepper, Bodine & Stokes* and *Schnader, Kenworthey, Segal & Lewis,* for Rich Hill Coal Company et al.

PER CURIAM, June 25, 1946:

Corporations engaged in mining anthracite and bituminous coal filed bills in equity in the Court of Common Pleas of Dauphin County challenging the constitutionality of workmen's compensation legislation enacted in 1937 and 1938. On petitions representing that only questions of law were involved we granted special certiorari to bring the records into this court for hearing as upon original jurisdiction.

The statutes complained of were the Act of June 4, 1937, P. L. 1552,[1] which, effective January 1, 1938, reenacted and amended the Workmen's Compensation Act of June 2, 1915, P. L. 736; the Act of July 2, 1937, P. L. 2714, which was the so-called "Occupational Disease Compensation Act"; and the Act of September 29, 1938, P. L. 52, which further amended the Workmen's Compensation Act of 1915.

On March 27, 1939, we filed an opinion written by Mr. Justice, now Chief Justice, MAXEY, reported in 334 Pa. 449, 7 A. 2d 302. Our decision was that certain portions of the acts were unconstitutional but it was pointed out that in regard to those provisions which prescribed the rates of compensation—those rates being attacked as unreasonable—essential facts were not contained in the record, which therefore had to be remitted to the court below for the taking of testimony and for "proper and ample" findings thereon. We said (p. 493, A. p. 324) that, except for the provisions specifically declared to be invalid, the acts were "not adjudged to be unconstitutional, but the questions as to the reasonableness of the compensation prescribed by them and as to the validity otherwise of their several provisions are left open for future judicial determination in appropriate proceedings in the court below, and on any appeal which may follow." For some reason which does not appear, plaintiffs, upon whom, of course, was the burden of proof, made no attempt thereafter to present any testimony

---

[1] This act will hereinafter be referred to as the Act of 1937.

in support of their complaints for a period of more than three years or until the end of the year 1942; in the meantime new legislation was enacted which cured many of the alleged evils that had been the subject of their attack. Finally, however, a number of witnesses were examined and documentary evidence was received. The learned court made findings of fact to the effect that the new compensation schedules were so high as to prevent the coal operators from earning any return on the capital invested, that payment of the increased rates would have resulted in the collapse of the coal mining industry in Pennsylvania, and that therefore the rates were invalid. Accordingly, the court entered a decree awarding a permanent injunction which restrained the Secretary of Labor and Industry from enforcing and administering the provisions of sections 306, 307 and 309 of the Act of 1937, those sections being the ones which established the schedules of compensation. The present appeal is by the Secretary from that decree.[2]

It must be stated at the outset that, since these cases are before this court as on original jurisdiction and were remanded to the court below merely for the purpose of taking testimony and making findings of fact, the entry of a decree was procedurally improper and the decree so entered must be regarded merely as recommended for our consideration and not as one subject to review in the ordinary sense of the term; while this course will make no difference to the parties in the result the procedure will conform to the fact. Although it is our own inferences from the testimony which must prevail we express our appreciation of the valuable services rendered by the learned court in taking the testimony and submitting its findings.

As previously stated, the scope of the controversy has been much reduced since the former hearing. By

[2] There are also appeals by three injured employes who were denied the right of intervention in the court below. In view of the conclusions here reached on the main issue it will not be necessary to discuss the questions raised on those appeals.

the Act of June 21, 1939, P. L. 520, the legislature has, as plaintiffs now state, "eliminated for the future" all the objections which they had to the Act of 1937. As this act became effective July 1, 1939 we are presently concerned with a consideration of the Act of 1937 only to the extent to which it was in operation during the 18 months period from January 1, 1938 to July 1, 1939. By the Act of June 21, 1939, P. L. 566, a new "Occupational Disease Act" was passed which repealed the Act of July 2, 1937, P. L. 2714, and accordingly plaintiffs state that they "have no further interest in the question whether that act was constitutional". Plaintiffs further say that, "as this court has decided the questions raised by amendment to the bills with respect to the Act of September 29, 1938, P. L. 52, those questions are wholly eliminated," and that, "in view of the fact that the Act of 1939 cured all of the plaintiffs' objections to particular sections of the Act of June 4, 1937, P. L. 1552, except as to application of the schedules of that act [sections 306, 307 and 309] to injuries and death which happened between January 1, 1938 and July 1, 1939, the plaintiffs do not press their specific objections to any sections except those containing the schedules. And the plaintiffs do not press their objection to the title of the act. Thus, there remains solely the question whether the schedules of the accident benefit act, the Act of June 4, 1937, P. L. 1552 . . . are 'reasonable' within the meaning of Article III, section 21, of the Constitution of Pennsylvania."

Before entering upon a consideration of the issue as thus limited it is proper first to call attention to the fact that of 43 anthracite coal companies which were either original plaintiffs or are interveners in this litigation, each and every one rejected the Act of 1937 and therefore have no standing to attack the rates which it established; none of them made, or will ever be called upon to make, any payment whatever under its provisions, so that they cannot be practically affected by any decision

here rendered; the issues are, as to them, wholly academic, and a litigant who has not shown that he is adversely affected by the actual operation of a statute cannot question its validity. The only plaintiffs properly before the court are three bituminous coal companies which accepted the act, that acceptance being, as they contend, a compulsory one. Thus there is apparently no party on the record with standing to challenge the rates so far as the anthracite industry is concerned although, curiously enough, it was only the anthracite companies which in their bills attacked the rates; in the bills brought by the bituminous companies the sole complaints were in regard to those features of the legislation which were disposed of in our former opinion. However, in view of the seriousness of the issues raised and of the earnestness with which they have been argued by eminent counsel, we deem it proper to discuss in some detail the merits of the controversy. Although the rates have not been generally assailed by any industry in the Commonwealth other than the coal companies, we recognize the important place which the coal mining industry occupies in our industrial economy and also its special interest in workmen's compensation legislation; it is an industry subject to such a large number of accidents that in 1936 and 1937 it paid more than one-third of all the benefits for those years under the workmen's compensation law.

The question is: Did plaintiffs prove that the challenged rates created a burden on the coal mining industry which the legislature could not constitutionally impose? In our opinion they have failed to measure up to that duty. The allegations which they made originally have not been substantiated by the evidence now before us. Relying on those allegations we said in our former opinion (p. 454, A. p. 305) that the new rates would mean to one of the plaintiffs, the Morrisdale Coal Mining Company, an increased cost of 11½ cents per ton of coal mined, that (p. 456, A. pp. 306, 307) the cost of work-

men's compensation to the anthracite operators of Pennsylvania would be increased by more than 100 per cent over the cost under the Act of 1915 and in many cases of total permanent disability and accidental death by approximately 200 per cent, and that (p. 462, A. p. 309) during the first four years of the operation of the Act of 1937 and the Occupational Disease Compensation Act of that year the cost to the anthracite industry in Pennsylvania would be respectively, $14,360,000, $16,880,000, $19,400,000 and $21,920,000, as against a cost of $2,600,000 in 1937 before the passage of those acts. But in fact the increased cost to the Morrisdale Coal Mining Company was shown to amount, not to 11½ cents per ton, but to somewhat under 2 cents per ton. It appears from the evidence that the increase of compensation that the anthracite operators would have been obliged to pay if the new rates had been in force in 1936 and 1937 would have been for the former year approximately $2,300,000 and for the latter approximately $2,150,000; in the case of the bituminous companies these increases would have been approximately $1,883,000 and $2,042,000 respectively; so that, on the basis of the number of accidents which actually occurred in coal mining operations during those two years the total increase to which the industry would have been subjected, had the new rates then been in force, would have been, for each of those years, approximately $4,187,000. Even if, therefore, we accept the plaintiff's present figures as correct (they were based on information obtained from operators producing 67% of the anthracite and 44% of the bituminous tonnage in those years) they fall far short of the representations which plaintiffs originally made and which they undoubtedly believed to be correct when their apprehensions were first aroused. Moreover an important criticism of their relevancy must be noted. They are figures which, as stated, represent the increase which the coal companies would have been obliged to pay *if* the new rates had been in effect during the years 1936

and 1937, being based upon the number of accidents which occurred during those years. As a matter of fact, however, we are concerned, not with the years 1936 and 1937, which were before the Act of 1937 went into effect, but with the increases which the new rates would have imposed upon the industry in 1938 and the first half of 1939, that being the only period during which the Act of 1937 was in operation. The constitutionality of an act depends upon its *practical operation and effect,* so that the question is not whether the rates would have been unreasonable in 1936 and 1937 but whether they were in fact unreasonable in 1938 and 1939 under the conditions existing in those years. When the testimony was taken in these cases in the court below, which was more than three years after July 1, 1939, the evidence was readily available as to the exact number of accidents which occurred during the crucial 18 months period and would have furnished the only reliable material upon which the operation of the new rates could have been evaluated, not as a theory, but as a reality. The bituminous companies which accepted the act could have given testimony as to the actual increases they were obliged to pay, but no such testimony was forthcoming.[3] This is important because the number of accidents which actually happened during the 18 months from January 1, 1938 to July 1, 1939 was considerably less than the number for the years 1936 and 1937. The Commonwealth contends that this falling off was due to the very increase in rates made by the new act, on the theory that the more costly that accidents are made to employers the more zealous they will be in introducing safety devices

---

[3] Incidentally it may be noted that none of the companies, anthracite or bituminous, which *rejected* the act produced any testimony as to the amounts they were obliged to pay for accidents during the 18 months period on the basis of common law liability. Such amounts may have been less than their expenditures had been under workmen's compensation, so that the rate increases which they say forced them out of the compensation system may not have been, even from that aspect, a detriment to their financial economy.

and maintaining careful operation of their plants; on the other hand the decrease may have been due to the greatly diminished production in 1938 and 1939. Whatever the cause, the fact remains that such a falling off occurred and indeed to such an extent that the largest anthracite company in this litigation admitted that the number of its compensable cases, which had been as high as 2000, went down to about 900. Defendants produced statistics from the Insurance Department of the Commonwealth which showed that accidents were 60% greater in 1937 than in 1938 and more than 100% greater than in 1939, so that instead of a 90% increase in anthracite compensation cost, as claimed by plaintiffs, the increase would have been approximately 55%, and instead of a claimed 70% increase in bituminous compensation cost the increase would have been approximately 47%. Therefore, when we consider the rates established by the Act of 1937 in their application to the accidents which occurred during the period when the act was in operation, we find that the increased cost to which the coal mining industry was actually subjected was substantially less than that shown by plaintiffs' figures based on accidents occurring during the years 1936 and 1937.

Even if, for present purposes, we accept the calculations which plaintiffs presented, it appears that, when applied to the tonnage of coal produced, the increase they claim would have amounted to less than 4½ cents a ton for anthracite and less than 2 cents a ton for bituminous. The court below expressed the *opinion,* which it stated as a *finding of fact,* that "The effect of the increase in the cost of workmen's compensation resulting from the application of the rates contained in the Act of June 4, 1937, P. L. 1552, upon the anthracite and bituminous coal mining industries of Pennsylvania would have been tantamount to collapse. A great number of producers would have been forced into bankruptcy; others would have been slowly driven towards the bankruptcy lines." But the evidence indicates that for many years prior to the

passage of the Act of 1937 the coal industry had already been in a state of "collapse" resulting from a variety of causes, the chief of which was the decline of production; this had been going on steadily for almost 20 years, the value of anthracite products dropping from $507,000,000 in 1923 to $180,000,000 in 1938 and the value of bituminous from $643,000,000 in Pennsylvania in 1920 to $152,000,000 in 1938. In the five years preceding the operation of the Act of 1937 companies producing one quarter of Pennsylvania anthracite had gone into bankruptcy or into reorganization proceedings under the bankruptcy act and the same was true of a large number of bituminous companies. The court below found as a fact that in the year 1937 the industry had suffered a loss of 39 cents a ton and that the deficit of the bituminous companies was approximately $14,000,000; the court added that "coal mining in 1937 was a terribly sick industry" and its condition was "desperate". A conclusion, therefore, that the compensation rates established by the Act of 1937 were responsible for the decline of the industry is untenable; indeed, since the anthracite companies which are parties to this litigation rejected the act and never paid any compensation under it, it follows that their financial reverses cannot fairly be attributed to the act of which they now complain. Of the total cost of the production of coal the item of labor is approximately 65%; the balance is made up principally of salaries of executive employes and the items of materials and supplies, heat, light and power, depletion, depreciation and taxes; the item of workmen's compensation is a comparatively minor one. Not only compensation rates but practically all these other items of cost had gone up, some of them enormously, in the years preceding 1938, with a resulting increase in the cost of production of anthracite coal from 1936 to 1938 of approximately 18 cents per ton.

The principal error which underlies the findings of the court below is its condemnation of the new rates be-

cause they were so much higher than they had been under the Act of 1915 as amended. It was thus impliedly taken for granted that the old rates were adequate and that any substantial increase must, therefore have made them excessive. But the one statute cannot be judged merely with relation to the other, for we cannot accept the assumption that the schedule of rates in the Act of 1915, as amended, constituted a fixed standard by which all subsequent legislatures were bound.

There is an additional weakness in plaintiffs' case. It was stated in our opinion in 334 Pa. (p. 490, A. pp. 321, 322) that consideration must be given to the *requirements of both employe and employer*. But there is no testimony in the record which furnishes material for an intelligent application of that specification other than a graph showing the changes in the cost of living between the years 1915 and 1941; here again there is an implied assumption that the ratio between the cost of living and the compensation rates prior to the Act of 1937 was one so fixed and so standard as not to be subject to any substantial revision or adjustment. Any schedule of rates which is unreasonable so far as the employe is concerned is as objectionable as it would be if unreasonable from the standpoint of the employer.

Section 306 of the Act of 1937 provides that the compensation for injuries resulting in total disability and for all disability resulting from certain permanent injuries there specified should be not less than $12 per week. Plaintiffs urge that this minimum might result in the compensation being greater in some cases than the amount of wages previously earned by the employe. The testimony indicated that the prescribed minimum exceeded wages only to an extremely trifling extent and for very limited periods. A wage of $12 per week is probably less than is earned by all but a negligible few—no such cases were shown to exist in the anthracite industry—so that this complaint is essentially de minimis. Moreover it has been held that such payments do not violate the due process clause of the 14th amendment to the

Federal Constitution: *New York Central R. R. Co. v. Bianc,* 250 U. S. 596, 602, affirming the decision of Judge CARDOZO in *Sweeting v. American Knife Co.,* 226 N.Y. 199, 200, 123 N.E. 82, 83.

To summarize, therefore,—while undoubtedly the power exists in the courts to pass upon the reasonableness of the rates established in this workmen's compensation act, we are of opinion that in the present instance plaintiffs have not shown that the rates prescribed in sections 306, 307 and 309 of the Act of June 4, 1937, P. L. 1552, were unconstitutional as applied to the period of 18 months during which they were in operation.

The decree in nos. 4 and 5, May Term, 1945 is vacated, and the bills are dismissed; the parties to bear their respective costs. The appeals in nos. 9, 10 and 11, May Term, 1944 are dismissed pro forma; costs to be paid by plaintiffs.

Mr. Justice JONES concurs in the result.